UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETHAN FAULKNER,<br><br>    Plaintiff,<br><br>    v.<br><br>LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD,<br><br>    Defendant. | Case No. 21-cv-00780-SI<br><br>**STATEMENT OF DECISION ON HEALTH & SAFETY CODE SECTION 1278.5 CLAIM** |

**BACKGROUND**

Plaintiff Bethan Faulkner, a Registered Nurse with a Doctor in Nursing Practice, was employed for nearly ten years by defendant Lucile Salter Packard Children's Hospital at Stanford ("LPCH"). She was employed first as a neonatal clinical specialist, then – beginning December 2018 – as the interim patient care manager of the neonatal intensive care unit ("NICU"), and finally – beginning June 2019 – as the patient care manager of the NICU. In her role as patient care manager ("PCM"), plaintiff supervised more than 150 nurses. Defendant terminated her employment on November 11, 2020. Plaintiff then filed suit in federal court. Dkt. No. 1.

Following this Court's order on summary judgment, *see* Dkt. No. 65, plaintiff had two claims remaining in this case: wrongful discharge in violation of public policy; and violation of California's medical whistleblower statute, Health and Safety Code section 1278.5. Plaintiff's wrongful discharge claim was anchored in the public policy articulated in Health and Safety Code section 1278.5. *See* Dkt. No. 17 ("Am. Compl.") ¶ 96. In preparation for trial, the parties stipulated to simultaneous presentation of the evidence to the jury and to the Court; the jury would decide the

wrongful discharge claim, and the Court would decide the section 1278.5 claim, pursuant to *Shaw v. Superior Court*, 2 Cal. 5th 983 (2017).

On February 1, 2023, this case proceeded to trial. On February 14, 2023, following a seven-day trial, the jury returned a verdict in favor of defendant. Specifically, the jury answered the first question on the verdict form as follows:

> 1. Did Beth Faulkner prove by a preponderance of the evidence that her presentation of a complaint or report about unsafe patient care, services, or conditions at LPCH, to LPCH or its medical staff, was a substantial motivating reason for her discharge?
>
> _____ Yes _____x\_\_\_\_\_No

Dkt. No. 126 at 2.

As to the remaining claim, for violation of Health and Safety Code section 1278.5, the Court is in receipt of the parties' post-trial briefing (*see* Dkt. Nos. 129, 130, 131), as well as the proposed findings of fact and conclusions of law the parties filed with their pretrial papers (*see* Dkt. Nos. 67, 80). The Court hereby renders its statement of decision as follows.

**LEGAL STANDARD**

As stated in *Shaw*,

> Section 1278.5—the whistleblower statute at issue here—declares generally that "it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of **suspected unsafe patient care and conditions**." (§ 1278.5, subd. (a).) In furtherance of this policy, the statute prohibits a health facility from "discriminat[ing] or retaliat[ing], in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person" has "[p]resented a grievance, complaint, or report to the facility" or to a governmental agency or has "participated ... in an investigation ... **related to the quality of care, services, or conditions at the facility**." (§ 1278.5, subd. (b)(1).)

2 Cal. 5th at 995-96 (emphases added). "Section 1278.5 does not explicitly limit the type of 'grievance, complaint, or report' for which retaliation is prohibited to one involving concerns about the quality of patient care. However, such a limitation is implicit in other provisions of the statute." *Fahlen v. Sutter Cent. Valley Hosps.*, 58 Cal. 4th 655, 667 n.6 (2014).

2

"Thus, to establish a prima facie case under section 1278.5, a plaintiff must show that he or she (1) presented a grievance, complaint, or report to the hospital or medical staff (2) regarding the quality of patient care and (3) the hospital retaliated against him or her for doing so." *Alborzi v. Univ. of S. Cal.*, 55 Cal. App. 5th 155, 179 (2020) (citing Cal. Health & Safety Code § 1278.5(b)(1)).

The statute also establishes a rebuttable presumption, affecting the burden of producing evidence, "that 'discriminatory action was taken . . . in retaliation against an employee, member of the medical staff, or any other health care worker of the facility' if the discriminatory action occurs 'within 120 days of the filing of a grievance or complaint by the employee, member of the medical staff, or, . . . other health care worker.'" *Shaw*, 2 Cal. 5th at 996 n.11 (quoting Cal. Health & Safety Code § 1278.5(c), (d), (e)).

**DISCUSSION**

In the amended complaint, plaintiff alleges that she:

was terminated in November of 2020 because of and in retaliation for her protected actions in making numerous reports about Dr. [Lisa] Bain's conduct, pursuant to Health and Safety Code § 1278.5. Ms. Faulkner bases this allegation on the fact that when she complained about Dr. Bain's conduct, including but not limited to Dr. Bain's refusal to listen to nurses' (including but not limited to Ms. Faulkner's) reports and concerns about patient care and treatment, and the negative impact of Dr. Bain's conduct on patient care, Ms. Faulkner was investigated, disciplined and eventually terminated. . . .

Ms. Faulkner suffered adverse employment actions as a result of her protected activities. Ms. Faulkner was terminated within 120 days of making reports about patient safety issues and patient care and treatment to executives and management at LPCH Stanford.

Am. Compl. ¶ 111.

As an initial matter, the parties dispute whether the Court is bound by the jury's finding. That is, defendant argues that the Court must "give effect to the jury's resolution in its determination of the section 1278.5(g) cause of action" and find in defendant's favor, given that the jury rejected plaintiff's claim for wrongful discharge in violation of public policy. Dkt. No. 129 at 5. Plaintiff disagrees. *See generally* Dkt. No. 130. The Court need not resolve this dispute because the Court independently finds that there was not sufficient factual evidence presented at trial for plaintiff to prevail on her claim for violation of Health and Safety Code section 1278.5.

In order to prevail on a claim under section 1278.5, the plaintiff must show that she presented a complaint *regarding the quality of patient care*. *Fahlen*, 58 Cal. 4th at 667 n.6; *Alborzi*, 55 Cal. App. 5th at 179. The complaints plaintiff presented at trial were largely complaints about her treatment by Dr. Lisa Bain, one of the doctors in the NICU, but were not directly about patient safety.

The only formal complaint that plaintiff filed during the relevant period was an iCare report dated September 2020.[1] *See* Trial Ex. 255. The inciting incident for the iCare was Dr. Bain sending a text message to plaintiff during a "NICU Culture Club zoom meeting," in which Dr. Bain badmouthed plaintiff. Trial Ex. 255-1. The text message was clearly meant for a different recipient. The entirety of plaintiff's two-page iCare report centers on Dr. Bain's unprofessional behavior, plaintiff's prior attempts to remedy this behavior, and how plaintiff was in fact putting a lot of time into an initiative ("gratitude and safety rounds") that Dr. Bain felt plaintiff was not supporting. In completing the iCare form, plaintiff categorized the complaint as one involving "Professional Conduct," "No Patient Involved." *Id.* Although plaintiff's iCare makes a passing reference to how Dr. Bain's conduct towards plaintiff "ultimately effects patient safety," *see id.*, this is not sufficient to transform the complaint into one regarding the quality of patient care. To find otherwise would be to greatly expand the protections of a statute that the Legislature enacted in order to promote the reporting "of suspected unsafe patient care and conditions." *See* Cal. Health & Safety Code § 1278.5(a).

Other less formal complaints that plaintiff made to her superiors and to Human Resources were similarly about Dr. Bain's treatment of plaintiff rather than about patient safety. For instance, plaintiff complained about Dr. Bain to Joe Wilson in HR. Wilson suggested plaintiff send him a timeline of events. The resulting timeline is a 28-page page chronicle of Dr. Bain's behavior towards plaintiff. *See* Trial Ex. 76; *see also* Trial Ex. 233. Plaintiff titled the document, "Timeline of unprofessional behavior of Lisa Bain toward Beth Faulkner compiled 8-10-2020 and based on as much as I can recall over the past 20 months that I have been the PCM of the NICU." Trial Ex. 76-

---

[1] An "iCare" is an internal reporting mechanism at LPCH.

2. As the title suggests, the focus of the timeline is on the unprofessional/bullying conduct of Dr. Bain and, to some extent, of Dr. Alexis Davis, Medical Director of the NICU. This type of complaint is not sufficient to put LPCH on notice that plaintiff was making a complaint regarding the quality of patient care. *Cf. Velente-Hook v. E. Plumas Health Care*, 368 F. Supp. 2d 1084, 1102 (E.D. Cal. 2005) ("Without knowledge of the plaintiff's complaints, the defendant could not retaliate against the protected whistleblowing activity" under Health and Safety Code section 1278.5).[2]

Additionally, the timeline plaintiff paints does not support her theory of retaliation. Plaintiff's theory is that she began to be retaliated against (primarily by Dr. Bain and Dr. Davis, but also by her supervisor Sheryl Goldstein) as soon as plaintiff began making patient safety complaints. But plaintiff herself stated in numerous documents that Dr. Bain was rude to her from the day that plaintiff assumed her role as interim patient care manager. *See* Trial Ex. 76-2 (timeline entry dated Dec. 3, 2018, stating, "The CNS, educator team, Lisa Bain and Alexis [Davis] were all upset over the decision to let [the prior patient care manager] go and the decision to hire me as interim manager. They would barely speak to me, acknowledge me, make eye contact or smile and say hello."); Trial Ex. 255-1 (plaintiff's Sept. 2020 iCare, stating, "I feel every action I take and everything I say is critiqued unfairly by Lisa [Bain] from the first day I took the job as interim and then permanent PCM"). As a matter of chronology, this behavior could not have been in retaliation for plaintiff complaining, because by plaintiff's own account the behavior occurred from her first day in the management role.[3] [4]

---

[2] Although a few of the dozens of events listed in the 28-page timeline mention patient care issues, plaintiff focuses on how Dr. Bain and Dr. Davis treated the nurses with regard to these conversations, rather than on the patient issues themselves.

[3] The time prior to plaintiff becoming interim patient care manager on December 3, 2018, is not at issue in this case. Plaintiff presented no evidence and made no arguments that she presented any complaints regarding the quality of patient care prior to assuming her role as interim patient care manager.

[4] Plaintiff suggested at trial that Dr. Bain treated her poorly from Day One because plaintiff's reputation as an advocate for patient safety preceded her. Yet Dr. Bain credibly testified that she didn't know of any reputation of plaintiff's because Dr. Bain had only started working at LPCH around the time plaintiff became interim PCM.

1    Finally, plaintiff made much at trial and in her papers about the "Aquadex" email, which
2    plaintiff sent on November 2, 2020, nine days before she was terminated. *See* Trial Ex. 114-3.
3    Aquadex was a new trial program that LPCH was running for very sick babies with kidney failure.
4    The email thread shows that these communications were about navigating the logistics of running
5    the Aquadex machine, rather than a complaint about the quality of patient care.[5] *See id.*
6    Additionally, in her closing, plaintiff's counsel argued that LPCH was upset with plaintiff over the
7    Aquadex email incident because the Aquadex trial program was a "cash cow" for the hospital. There
8    was no evidence at trial to support this statement

9    Because the Court finds that plaintiff failed to present any complaints regarding the quality
10   of patient care, plaintiff is not entitled to the rebuttable presumption in Health and Safety Code
11   section 1278.5(d). Even if she were so entitled, the Court finds that defendant adequately rebutted
12   the presumption by presenting sufficient evidence at trial that it terminated plaintiff for performance-
13   related reasons and not for medical whistleblowing. Although the termination letter itself appears
14   to have been hastily written and contains inaccuracies, *see* Trial Ex. 130,[6] several of the defense
15   witnesses testified that they had concerns about plaintiff's management priorities from the

---

[5] Plaintiff's November 2, 2020 email reads:

Hi Alexis,

At this time we do not have the capacity staffing wise to take additional babies that will be put on Aquadex. We are working on a plan to provide necessary training but for now we are having trouble accommodating 3 babies.

Thank you for your patience with us while we work out a plan.

Also, what is the expected time frame to run this 24/7? Are you just waiting on trained RNs on night shift or is it dependent on Dialysis department? What are your thoughts?

Hope you have a wonderful day!

Beth Faulkner DNP, NEA-BC, MN, CCNS, RNC-NIC . . .

Trial Ex. 114-3.

[6] For instance, in the termination letter, Sheryl Goldstein wrote that plaintiff "[s]topp[ed] a critical program due to staffing," referring to the Aquadex program. *See* Trial Ex. 130-2. But Goldstein admitted at trial that plaintiff had not in fact stopped the program, and no witnesses testified that any babies were turned away as a result of plaintiff's Aquadex email.

6

beginning, and that those concerns did not alleviate over time.

Kristine Boyle, for instance, wrote to plaintiff's supervisor in March 2019, when she learned plaintiff was being considered for the permanent patient care manager role, to express her concerns about whether plaintiff was up to the task.[7] Trial Test. of Kristine Boyle; Trial Ex. 203. Boyle wrote that she was concerned that plaintiff's "sole focus" was being liked by her staff, and that this came "at the expense of running a tight ship." Trial Ex. 203-1.

Although plaintiff received a positive performance review on June 15, 2020, *see* Trial Ex. 23, colleagues who provided input on the performance review to plaintiff's supervisor did not rank plaintiff so highly. Numerous colleagues rated plaintiff as "Learning" or "Stalled" (i.e., the lowest or second-lowest ranking) in categories such as Communication, Accountability, and Teamwork. Trial Ex. 26; Trial Ex. 219; Trial Ex. 275. Notably, all of this feedback occurred *before* the date that plaintiff identifies as the major catalyzing event leading to the retaliation and termination (i.e., the June 24, 2020 iCare report filed by one of plaintiff's subordinates).

Several witnesses testified that it was plaintiff's mismanagement of staff that was putting patient safety at risk. Multiple witnesses testified to the fact that when the hospital changed the line set-up for the babies in the NICU, using evidence-based practices and in response to a concern about rising infection rates, plaintiff undermined the implementation efforts. When nurses continued to use the old line set-up, rather than speaking to her staff to ensure they followed the new practice, plaintiff supported them in lobbying to change the procedure back to the old method. Michelle Rhein provided credible testimony that plaintiff's behavior in this regard was "reckless" and could cost a baby their life, as the new line set-up would reduce the chance of infection.[8] Trial Test. of Michelle Rhein; *see also* Trial Test. of Alexis Davis; Trial Ex. 202. Kristi Boyle likewise wrote to plaintiff's supervisor that plaintiff's handling of the line set-up "debacle" resulted in a "complete waste of time" that "undermine[d] the work of others." *See* Trial Ex. 203-1.

It is also true, however, that the hospital did not implement a progressive discipline plan, as

---

[7] Boyle is a Neonatal Nurse Practitioner.

[8] At that time, Rhein was a neonatal clinical nurse specialist and worked on quality improvement initiatives for the NICU at LPCH.

one might expect to see for an employee of plaintiff's tenure and stature. Sheryl Goldstein put plaintiff on a 60-day performance improvement plan, more or less without warning to plaintiff, just a few months after giving plaintiff a positive performance review; Goldstein then failed to put a clear plan in place or to communicate with plaintiff when the 60 day PIP ended. Prior to her actual termination, no one informed plaintiff that her job was at risk or that she faced potential termination. Nevertheless, the Court cannot find based on the evidence before it that defendant terminated plaintiff for medical whistleblowing in violation of section 1278.5.

Finally, the Court denies plaintiff's request to allow additional presentation of evidence on the section 1278.5 claim. *See* Dkt. No. 130 at 30-31. The parties agreed at the outset of trial that this claim would be "tried before the Court, simultaneously with the presentation of evidence to the jury, and the Court will render a decision after the jury's verdict . . . ." Dkt. No. 76 at 3. The Court granted plaintiff eleven hours of trial time, plus an additional hour at plaintiff's request. Dkt. No. 104. Although plaintiff had run out of time when she rested her case, the Court allowed plaintiff additional time for cross-examination of the defense witnesses. The Court also granted plaintiff an additional fifteen minutes (for a total of one hour, fifteen minutes) for closing argument. Plaintiff knew that the Court would be determining the equitable claim on the same evidence that was presented to the jury; indeed, plaintiff and defendant jointly proposed this. The Court will not re-open the evidence at this stage.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiff has failed to meet her burden with respect to her claim for a violation of Health and Safety Code section 1278.5.

**IT IS SO ORDERED**.

Dated: March 3, 2023

_____
SUSAN ILLSTON
United States District Judge