1

2

3

4                      UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    BETHAN FAULKNER,                          Case No. 21-cv-00780-SI

8                   Plaintiff,

9          v.                                  **ORDER DENYING PLAINTIFF'S
                                               POST-TRIAL MOTIONS**
10   LUCILE SALTER PACKARD
     CHILDREN'S HOSPITAL,                      Re: Dkt. Nos. 138, 139

11                  Defendant.

12

13

14

15          This case went to trial on the question of whether plaintiff Bethan Faulkner would prove by

16   a preponderance of the evidence that defendant Lucile Salter Packard Children's Hospital at

17   Stanford ("LPCH") terminated her in retaliation for whistleblowing on patient safety issues.  The

18   jury determined that she did not.  Dkt. No. 126.  The Court then found that plaintiff had not proven

19   her whistleblowing claim under California law.  Dkt. No. 133.  Pursuant to Federal Rules of Civil

20   Procedure 52 and 59, plaintiff now moves for amended findings and/or to alter the judgment and for

21   a new trial on her claims: (1) for violation of California Health and Safety Code section 1278.5

22   (which was decided by the Court); and (2) for wrongful discharge in violation of public policy

23   (which was decided by the jury).  Dkt. Nos. 138, 139.

24          For the reasons stated below, the Court denies plaintiff's motions for post-trial relief.

25

26                                     **BACKGROUND**

27          Plaintiff, a Registered Nurse with a Master's and Doctorate degrees, was employed by

28   defendant LPCH for nearly ten years.  She worked as a neonatal clinical specialist until December

United States District Court
Northern District of California

2018, when she became interim patient care manager of the neonatal intensive care unit ("NICU"). In June 2019, she became patient care manager ("PCM") of the NICU. In that role, plaintiff supervised more than 150 nurses. On November 11, 2020, LPCH terminated her employment. Plaintiff then filed suit in federal court. Dkt. No. 1.

In her amended complaint, plaintiff brought six claims for relief: two claims for violations of the federal Family Medical Leave Act ("FMLA"); disability discrimination and retaliation in violation of the California Fair Employment and Housing Act ("FEHA"); wrongful discharge in violation of public policy; and violation of California's statute protecting whistleblowing by health care workers. Dkt. No. 17. Plaintiff alleged that LPCH retaliated and discriminated against her after she requested disability-related FMLA leave. Her claim for wrongful discharge was tethered to: (1) her "report[ing] issues with patient care and safety and (2) tak[ing] medical leave." *Id.* at 22. At summary judgment, the Court determined that the undisputed facts showed the "FMLA claims suffer[ed] a critical timing problem: defendant's decision to terminate plaintiff occurred several hours *before* plaintiff filed her FMLA claim . . . ." Dkt. No. 65 at 6. The Court further found the evidence did not show that plaintiff suffered from a disability that was protected under FEHA. *Id.* at 9-10. The Court granted summary judgment to defendant on the FMLA and FEHA claims.

Following the Court's order on summary judgment, two claims remained in this case: wrongful discharge in violation of public policy; and violation of California's medical whistleblower statute, Health and Safety Code section 1278.5. Plaintiff's wrongful discharge claim was tethered to the public policy articulated in Section 1278.5.[1] *See* Dkt. No. 17 ("Am. Compl.") ¶ 96. In preparation for trial, the parties stipulated to simultaneous presentation of the evidence to the jury and to the Court. The jury would decide the wrongful discharge claim, and the Court would decide the Section 1278.5 claim, pursuant to *Shaw v. Superior Court*, 2 Cal. 5th 983 (2017).

On February 1, 2023, the case proceeded to trial. On February 14, 2023, following a seven-day trial, the jury returned a verdict in favor of defendant. Specifically, the jury answered the first question on the verdict form as follows:

---

[1] All references in this Order to "Section 1278.5" are to California Health and Safety Code section 1278.5.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> 1. Did Beth Faulkner prove by a preponderance of the evidence that her presentation of a complaint or report about unsafe patient care, services, or conditions at LPCH, to LPCH or its medical staff, was a substantial motivating reason for her discharge?
>
> _____ Yes _____x_____ No

Dkt. No. 126 at 2.

As to the remaining claim, for violation of Health and Safety Code section 1278.5, the parties submitted proposed findings of fact and conclusions of law with their pretrial papers (Dkt. Nos. 67, 80) as well as post-trial briefing (Dkt. Nos. 129, 130, 131).  On March 3, 2023, the Court issued its Statement of Decision on the Section 1278.5 claim.  Dkt. No. 133.  The Court found "there was not sufficient factual evidence presented at trial for plaintiff to prevail on her claim for violation of Health and Safety Code section 1278.5."[2]  *Id.* at 3.  The Court entered judgment in favor of defendant and against plaintiff that same day.  Dkt. No. 134.

Plaintiff then filed the present motions for amended findings and/or to alter the judgment and for a new trial on the Section 1278.5 claim and the jury claim.  Dkt. Nos. 138, 139.  Defendant opposes, and plaintiff has filed reply briefs.  Dkt. Nos. 158, 159, 162, 163.  Following a hearing on July 14, 2023, the parties submitted supplemental briefing.  Dkt. Nos. 167, 169, 170.  On August 22, 2023, the Court held an evidentiary hearing with the jury foreperson regarding the question of potential juror bias.

This Order now follows.

---

[2]  As the Court also noted in that order:  "It is also true, however, that the hospital did not implement a progressive discipline plan, as one might expect to see for an employee of plaintiff's tenure and stature.  Sheryl Goldstein put plaintiff on a 60-day performance improvement plan, more or less without warning to plaintiff,  just a few months after giving plaintiff a positive performance review; Goldstein then failed to put a clear plan in place or to communicate with plaintiff when the 60 day PIP ended.  Prior to her actual termination, no one informed plaintiff that her job was at risk or that she faced potential termination.  Nevertheless, the Court cannot find based on the evidence before it that defendant terminated plaintiff for medical whistleblowing in violation of section 1278.5."  Dkt. No. 133 at 7.

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 52 provides that, "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b).

Under Federal Rule of Civil Procedure 59, a party may file a motion for reconsideration and/or a motion for new trial within twenty-eight days of the entry of the judgment. Fed. R. Civ. P. 59(e). Rule 59(a)(1) states, "The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1). As the Ninth Circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted . . . ." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Instead, the court is "bound by those grounds that have been historically recognized." *Id.* "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

**DISCUSSION**

**I.      Motion for Relief on Health and Safety Code Section 1278.5 Claim**

Plaintiff moves for relief from the judgment and for a new trial on her claim for violation of Health and Safety Code section 1278.5, California's medical whistleblowing statute. The Court decided this claim upon the same evidence presented to the jury. Plaintiff argues that: the Court's findings were based on errors of law and fact; the findings regarding the application of the statutory

4

presumption were erroneous; the findings regarding plaintiff's "poor performance" were clearly erroneous; and the Court's finding on the Section 1278.5 claim was factually erroneous and contrary to the weight of the evidence.

For context, the Court repeats here the legal standard from its Statement of Decision:

> Section 1278.5—the whistleblower statute at issue here—declares generally that "it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of **suspected unsafe patient care and conditions**." (§ 1278.5, subd. (a).) In furtherance of this policy, the statute prohibits a health facility from "discriminat[ing] or retaliat[ing], in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person" has "[p]resented a grievance, complaint, or report to the facility" or to a governmental agency or has "participated ... in an investigation ... **related to the quality of care, services, or conditions at the facility**." (§ 1278.5, subd. (b)(1).)

*Shaw*, 2 Cal. 5th at 995-96 (emphases added).  "Section 1278.5 does not explicitly limit the type of 'grievance, complaint, or report' for which retaliation is prohibited to one involving concerns about the quality of patient care.  However, such a limitation is implicit in other provisions of the statute." *Fahlen v. Sutter Cent. Valley Hosps.*, 58 Cal. 4th 655, 667 n.6 (2014).

"Thus, to establish a prima facie case under section 1278.5, a plaintiff must show that he or she (1) presented a grievance, complaint, or report to the hospital or medical staff (2) regarding the quality of patient care and (3) the hospital retaliated against him or her for doing so." *Alborzi v. Univ. of S. Cal.*, 55 Cal. App. 5th 155, 179 (2020) (citing Cal. Health & Safety Code § 1278.5(b)(1)).

The statute also establishes a rebuttable presumption, affecting the burden of producing evidence, "that 'discriminatory action was taken . . . in retaliation against an employee, member of the medical staff, or any other health care worker of the facility' if the discriminatory action occurs 'within 120 days of the filing of a grievance or complaint by the employee, member of the medical staff, or, . . . other health care worker.'"  *Shaw*, 2 Cal. 5th at 996 n.11 (quoting Cal. Health & Safety Code § 1278.5(c)-(e)).  This presumption is a presumption "affecting the burden of producing evidence as provided in Section 603 of the Evidence Code."  Cal. Health & Safety Code § 1278.5(e).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   **A.      Factual Background**

2       The relevant events took place between December 2018, when plaintiff became interim

3   patient care manager of the NICU at LPCH, and November 11, 2020, when she was terminated.

4   The Court will briefly outline the prominent events in support of plaintiff's claim.

5       Plaintiff first came into the role of interim PCM after receiving a recruitment call from Sheryl

6   Goldstein in November 2018.  Trial Tr. vol. 5, 954:18-23 (Feb. 8, 2023).  Goldstein and plaintiff

7   had worked together for a number of years.  *See id.* at 954:24-955:1.  Once plaintiff was hired into

8   the interim PCM role, Goldstein became plaintiff's supervisor.  Plaintiff began her new role in early

9   December 2018.  As interim PCM, she supervised about 185 nurses.  *Id.* at 966:6-8.

10      In February 2019, the "line set-up" incident took place.  As plaintiff described at trial, a well-

11  respected nurse on the unit (Terry Hayden) came to her "with a patient complaint, a safety complaint

12  in regards to line setup[.]"  *Id.* at 956:4:10.  The concern involved the set-up of the IV lines connected

13  to the babies, some of whom may have 8 to 10 various lines, and the accompanying possibility of

14  infection.  *Id.* at 956:13-18.  Plaintiff explained that the way they were doing it in the NICU

15  "look[ed] like a spaghetti mess of lines - - which is a patient safety concern in regards to even the

16  nurses tracing the line and making sure they know which medication is going to which line, besides

17  the length of time it gets in there."  *Id.* at 962:9-15.  Plaintiff supported Hayden in bringing her

18  concerns and a proposed solution about the line set-up to a "LIT" (Local Improvement Team)

19  meeting.  Dr. Lisa Bain, a physician and Director of Quality Improvement in the NICU, was one of

20  the meeting attendees.  Plaintiff testified that at the meeting Dr. Bain treated Hayden disrespectfully

21  and that Hayden went home in tears.  In a timeline of events plaintiff later filed with Human

22  Resources, plaintiff stated that after this incident Dr. Bain began excluding plaintiff from

23  conversations, shutting plaintiff down, and sabotaging her.  *See* Trial Ex. 76-5.[3]

24      On May 5, 2019, plaintiff resigned her role as interim patient care manager of the NICU.  A

25  group of nurses petitioned for her to stay in the role.  Plaintiff also had conversations with

26

27      [3] Two of the entries on the timeline are erroneously dated February 2018.  *See* Trial Ex. 76-
   5.  As explained at trial, the incident involving Hayden and the line set-up occurred in February
28  2019.

6

management, who agreed to hire an executive coach.  Plaintiff was offered and accepted the non-interim role of patient care manager of the NICU in June 2019.

The following year was largely without incident, at least as highlighted at trial.  In June 2020, Andrew Palmquist became Associate Chief Nursing Officer over the NICU.  In that role, he supervised Sheryl Goldstein, who supervised plaintiff.  That same month, plaintiff received a performance review.  Goldstein solicited feedback from others within the hospital.  Although some of the doctors had critiques of plaintiff's performance, *see, e.g.*, Trial Ex. 26, the review plaintiff received from Goldstein was quite positive.  *See* Trial Ex. 23.

On or about June 24, 2020, one of the nurses whom plaintiff supervised (Sarah Wallace) filed an iCare report voicing concern that the recent increase in necrotizing enterocolitis ("NEC") in the NICU was related to the method by which the nurses were instructed to feed the babies and the NICU's use of Prolacta, a feeding supplement.[4]  *See* Trial Ex. 160.  Plaintiff testified that on June 29 she went to Palmquist's office to talk to him about the increased incidence of NEC and about the unprofessional behavior of Dr. Bain and of Dr. Alexis Davis, medical director of the NICU.  Trial Tr. vol. 5, 950:19-951:11, 976:14-977:5.

On June 29, 2020, plaintiff sent to all NICU staff what became known as the "Prolacta email," sharing with them a copy of an invoice she had recently approved for Prolacta.  *See* Trial Ex. 36 at 5-6.  The context for this is explained further below, but the fallout was that Dr. Bain replied to plaintiff, and to a select group of other individuals, questioning why plaintiff had sent the email.  Plaintiff forwarded Dr. Bain's email to Palmquist as an example of the unprofessional conduct about which plaintiff had told him.  On July 1, 2020, Palmquist came to see plaintiff at her office and told her that Dr. Bain's conduct was unprofessional and that plaintiff had his full support.

From July 17 through July 28, 2020, plaintiff was out of the office on vacation/"mandatory leave."  Trial Tr. vol. 5, 978:20-979:2.  During that time, on July 20, 2020, Palmquist met with Goldstein, Dr. Bain, and Dr. Davis.  Trial Tr. vol. 3, 534:4-6 (Feb. 6, 2023).  At trial, he explained that the meeting was: "Me coming in as a new leader in that area, hearing Beth's reports of concerns

---

[4] An "iCare" is an internal reporting mechanism at LPCH.

related to how Dr. Bain was treating and interacting.  That was my next step in making sure Dr. Bain heard as well as Dr. Davis being a medical director as well as Beth's direct supervisor Sheryl.  So, the purpose was to regroup us all and talk about what was working and not working for us to align a better partnership to move forward." *Id.* at 534:22-535:7.

On July 28, 2020, the morning that plaintiff returned from vacation, she was called into a meeting with Palmquist, Goldstein, Dr. Bain, and Dr. Davis.  Trial Tr. vol. 5, 979:18-25.  Plaintiff had expected the meeting would be about the concerns she raised to Palmquist before her vacation; instead, she discovered the meeting was about plaintiff's own performance.  Plaintiff testified, "I knew right away, right then, that day, I was being retaliated against for my patient safety concerns that I had raised and I had escalated up to Andrew Palmquist right before I left on my vacation.  And that all - - all related back to the increased incidence of necrotizing enterocolitis and that patient safety complaint." *Id.* at 980:9-15.

A few days later, on July 31, 2020, plaintiff contacted Joe Wilson in Human Resources and told him that two doctors on her unit were creating a "hostile environment" for her.[5]  Trial Ex. 62 at 2.  On August 6, 2020, plaintiff and Wilson had a follow-up phone call, in which plaintiff voiced concerns about Dr. Bain's unprofessional behavior as well as concerns that she was being retaliated against for reporting the behavior.  Trial Tr. vol. 4, 657:6-658:16 (Feb. 7, 2023).  Following that call, Wilson emailed Palmquist that plaintiff had contacted him "out of concern for retaliation" and to discuss her repeated escalation of problems regarding Dr. Bain's professionalism.  Trial Ex. 230 at 1.  The email thread shows that Wilson and Palmquist had been in communication about a possible performance improvement plan ("PIP") for plaintiff since August 3 or earlier.  *See id.*

On August 7, 2020, Goldstein informed plaintiff that she was being put on a 60-day PIP.  On August 10, 2020, plaintiff emailed Wilson a 29-page document titled, "Timeline of unprofessional behavior of Lisa Bain toward Beth Faulkner compiled 8-10-2020 and based on as much as I can recall over the past 20 months that I have been the PCM of the NICU." *See* Trial Ex. 76 at 2.  On

---

[5] Wilson was a manager in Human Resources, also known as the office of Employee and Labor Relations ("ELR").

August 28, 2020, plaintiff's 60-day PIP formally issued, signed by plaintiff and Goldstein.  *See* Trial Ex. 95.  On that same date, Luanne Smedley replaced Palmquist as Associate Chief Nursing Officer over the NICU.  *See* Trial Tr. vol. 4, 741:14-17.  During the transition, Smedley met several times with Goldstein to learn more about the center at LPCH that housed the NICU.  Those discussions included discussions about plaintiff.  *Id.* at 741:18-742:25.

On September 14, 2020, plaintiff attended a Zoom meeting, during which time Dr. Bain inadvertently sent plaintiff a text message, clearly intended for another recipient, in which Dr. Bain made a disparaging comment about plaintiff.  Trial Tr. vol. 6, 1177:8-18 (Feb. 9, 2023).  At trial, plaintiff testified that after she sent Wilson the timeline of events in August, he told her "to do an iCare if anything else came up between Lisa [Bain] and I.  So I did and - - she sent me rude texts and so I did an iCare." [6]  Trial Tr. vol. 5, 983:24-984:13; *see also* Trial Ex. 255 (plaintiff's iCare).

On November 2, 2020, plaintiff sent what became known as the "Aquadex email" to Dr. Davis and others.  *See* Trial Ex. 114 at 3.  The substance of the email was the subject of great debate at trial and is discussed in further detail below.  Dr. Davis replied to the email, copying Goldstein and Smedley, "for situational awareness."  *Id.* at 2-3.  Smedley replied directly to Goldstein, asking,

> Were you aware of this before she sent this to Alexis [Davis]?
> This is concerning.
>
> Can you also set up time to discuss her PIP?

*Id.* at 2.

On November 8, 2020, Goldstein sent a PIP update to Wilson and Smedley for their review.  *See* Trial Ex. 118.  The following day, Smedley responded to Goldstein and Wilson with edits to the PIP.  *See* Trial Ex. 266.  On November 10, Wilson replied to Smedley and Goldstein via email stating, among other things, "Next steps after a PIP for an At-Will employee if they are still not meeting expectations would be termination or an extension of the PIP."  Trial Ex. 264 at 1-2.  Five minutes later, Smedley replied, "We have decided on termination . . . she has had plenty of time for

---

[6] For unknown reasons, the iCare report states that the "Event Date" was September 9, 2020, and the iCare was "entered" on September 22, 2020.  *See* Trial Ex. 255 at 1-2.  Plaintiff sent an email to Wilson on September 14, 2020, in which she stated that she filed the iCare that morning. *See* Trial Ex. 233 at 4.

*Left margin: United States District Court / Northern District of California*

1    improvement without success." *Id.* at 1.  On November 11, 2020, plaintiff was terminated.  *See*

2    Trial Ex. 130.

3

4    **B.    Whether the Findings Re: Complaints Were Based on Errors of Law and Fact**

5    In its Statement of Decision, the Court found that "[t]he complaints plaintiff presented at

6    trial were largely complaints about her treatment by Dr. Lisa Bain, one of the doctors in the NICU,

7    but were not directly about patient safety."  Dkt. No. 133 at 4.  The Court analyzed the "iCare"

8    report that plaintiff filed in September 2020, since that was the "only formal complaint that plaintiff

9    filed during the relevant period[.]"  *Id.*  The Court also examined "[o]ther less formal complaints

10   that plaintiff made to her superiors and to Human Resources[,]" finding they "were similarly about

11   Dr. Bain's treatment of plaintiff rather than about patient safety."  *See id.* at 4-5.  Plaintiff now

12   argues that the Court's findings were erroneous as a matter of law and fact.

13

14   **1.    Unprofessional Conduct as a Matter of Law**

15   Plaintiff's opening argument is that the Court's finding was legally erroneous because, she

16   contends, "as a matter of law, complaints about a doctor's unprofessional conduct are complaints

17   about suspected unsafe patient care, services, or conditions."  Dkt. No. 138 at 8.  The Court

18   disagrees.

19   As support, plaintiff cites numerous California and federal laws regulating unprofessional

20   behavior by physicians.  Whether or not the law regulates physicians' behavior, though, is not the

21   same as whether all complaints about unprofessional behavior by a physician are *per se* complaints

22   about patient care, services, or conditions.  Plaintiff states that her contention is undisputed "because

23   **<u>all of the trial witnesses agreed:</u>** a doctor who engages in unprofessional conduct in the workplace

24   can present unsafe patient care and conditions."  *Id.* at 9.  But the hypotheticals that plaintiff's

25   counsel posed at trial – that unprofessional conduct by a doctor *could* present unsafe patient care

26   and conditions – does not support plaintiff's assertion that unprofessional conduct by a doctor

27   creates a patient safety issue in every instance.  Plaintiff cites no case to support her contention that,

28   *as a matter of law*, any unprofessional conduct by a doctor in a hospital setting always rises to the

United States District Court
Northern District of California

level of a patient safety issue that is protected by Section 1278.5. Rather, the cases that plaintiff cites are all highly fact-specific. *See id.* at 8 n.1. The Court declines to find that plaintiff presented complaints that were protected under Section 1278.5 as a matter of law.

### 2.    Unprofessional Conduct in This Case

Plaintiff also argues that the Court's finding was factually erroneous "because Plaintiff's complaints about the doctors did meet the statutory definition." *Id.* at 8. The critical question in this case is whether plaintiff proved by a preponderance of the evidence that her complaints or reports were ones "regarding the quality of patient care," as required to state a prima facie claim under Section 1278.5. *See Alborzi*, 55 Cal. App. 5th at 179. In her post-trial motions, plaintiff references numerous complaints or reports that she alleges she made that were protected under Section 1278.5. She also forwards two main theories of how LPCH unlawfully retaliated against her. First, she argues that in August 2020 she was put on a 60-day performance improvement plan in retaliation for bringing complaints regarding Dr. Bain to Andrew Palmquist and Sheryl Goldstein in late June and early July (that is, NEC and the "Prolacta email"). Second, she argues that she was terminated on November 11, 2020, because of an email she sent on November 2 regarding the lack of trained nurses to run the NICU's Aquadex program (that is, the "Aquadex email.").

#### a.    Timeline of Events Sent to Human Resources

Plaintiff cites the timeline that she sent to Joe Wilson in HR on August 10, 2020. *See* Trial Ex. 76. The primary focus of the timeline is Dr. Bain's behavior toward plaintiff (and to some extent toward other nurses), such as Dr. Bain's "noticeably short condescending manner" and "sabotaging" plaintiff. *See id.* at 3, 5. The Court has reread the timeline in its entirety and finds no reason to disturb its prior finding that this timeline chronicles unprofessional conduct and does not constitute a complaint or report about patient safety. Although the timeline discusses some patient-related issues, such as a nurse concerned about the feeding pathway and its connection to the rise in NEC, the timeline does not say that plaintiff reported this concern to anyone. In fact, it says that the nurse ultimately brought her concerns to someone other than plaintiff and at that person's suggestion the

11

United States District Court
Northern District of California

nurse filed an iCare. *See id.* at 16.  Much of the timeline chronicles rude or belittling behavior, such as: Dr. Bain would often go directly to Goldstein with a problem instead of to plaintiff; Dr. Bain refused to get into a photo with the nurses in the staff lounge; or Dr. Bain and Dr. Davis never congratulated plaintiff on the NICU's positive U.S. News and World Report ranking.

The timeline culminates with plaintiff's written summary, which she cites in her briefs as evidence that she was making complaints bearing on patient safety.  *See* Dkt. No. 138 at 12 (citing Trial Ex. 76-29); Dkt. No. 139 at 23, 28 (same).  In this exhibit, plaintiff discusses the impact of Dr. Bain's behavior on plaintiff's own performance.  It says nothing about patient safety concerns, either specifically or in the abstract.  Plaintiff states, in part:

> . . . I feel Lisa Bain is sabotaging my reputation within the executive team where I do not have a voice.  Hence, I am reaching out to you (Joe Wilson) for help and guidance in this difficult situation.  **These behaviors have been occurring throughout my tenure as PCM but recently after Kelly Johnson CNO left the organization, they have become increasingly more difficult again.**
>
> I keep speaking up via the nursing chain of command, but no one is addressing Lisa's behavior.  Conflicts not addressed effectively lead to a major risk factor for burnout.  I am feeling the effects of burnout due to these ongoing issues that are consistently not addressed.  Lisa Bain and I have vastly different values on how to treat people. . . .

Trial Ex. 76 at 29.

### b.       Plaintiff's iCare

The Court has also reexamined the iCare that plaintiff filed on September 14, 2020.  This is the only iCare that plaintiff filed during the relevant period.  She filed this following a NICU "Culture Club" Zoom meeting, during which Dr. Bain accidentally sent the following text message to plaintiff, while plaintiff was talking about safety and gratitude rounds: "She talks as if she's been helping.  She hasn't.  Beth that is[.]" Trial Ex. 255 at 1.  The iCare expressly indicates at the top: "No Patient Involved."  *Id.*  It details Dr. Bain's disrespect toward plaintiff.  In the iCare, plaintiff explains that she "felt directly attacked and undermined as a leader," and that "[t]his is not the first time Lisa [Bain] has sabotaged my efforts and it is an ongoing problem."  *Id.*  In the middle of the report, plaintiff states the following: "Lisa to realize that as she undermines my leadership, aligns others against me and sabotages my efforts this leads to lack of psychological safety and decreased

team performance and ultimately effects [sic] patient safety." *Id.* The remainder of the report chronicles the work plaintiff did to support the safety and gratitude rounds. The report concludes by stating that plaintiff has tried bringing her concerns about Dr. Bain's behavior and psychological safety to others. She ends: "Each time Lisa has never been held accountable. I was advised by ELR to do an iCare the next time. So this is not typically my way of dealing with problems with others. However, I have tried to address this unprofessional behavior directly and it has not made a difference." *Id.* at 2. Read in context, the single passing reference to "patient safety" quoted above is not sufficient to transform a complaint about Dr. Bain's unprofessional conduct into a complaint that is protected under Section 1278.5.

Further evidence of this may be found in the follow-up email plaintiff sent to Wilson to tell him that she filed an iCare earlier that morning. In her briefs, plaintiff cites this email as further proof that she was filing a patient safety complaint. *See* Dkt. No. 138 at 12; Dkt. No. 139 at 23, 28. Instead, the email undermines plaintiff's position. The email provides a long summary, cutting and pasting large portions of the iCare. The email does not mention patient safety, nor did plaintiff copy that portion of her iCare that referenced patient safety. In other words, despite plaintiff's current position that this iCare was a patient safety complaint, the iCare itself and her contemporaneous explanation of the iCare indicate otherwise.

The Court finds no reason to disturb its prior conclusion that plaintiff failed to prove by a preponderance of the evidence that her September 2020 iCare was a report "regarding the quality of patient care" such as is required to come within Section 1278.5's whistleblowing protections. *See Alborzi*, 55 Cal. App. at 179.

### c.      NEC and Prolacta Email

The context for plaintiff's complaints to Palmquist in June/July 2020 originated with a rising incidence of necrotizing enterocolitis ("NEC") in the LPCH NICU. As numerous witnesses testified at trial, NEC is a serious concern and potentially fatal to newborn babies. Some of the nurses in the NICU were concerned that the new feeding pathway the hospital was using was too "aggressive" and was causing some babies not to tolerate their food, thereby explaining the recent rise in NEC.

Intertwined in this were concerns regarding the NICU's use of Prolacta as a feeding supplement, and whether the babies were digesting the Prolacta properly.

In June 2020, one of the nurses working under plaintiff, Sarah Wallace, approached plaintiff with her concerns about how quickly the NICU was progressing feeding for premature babies, the use of Prolacta, and whether these two things were related to the rising incidence of NEC. *See* Trial Ex. 76 at 16 (plaintiff's timeline of events); Trial Ex. 160. Plaintiff suggested the nurse discuss the concern with Dr. Bain. The nurse replied that Dr. Bain would "just shut [her] down." Trial Ex. 76 at 16. Plaintiff then suggested the nurse speak with Dr. Davis. When Dr. Davis did not listen, the nurse went to clinical practice lead RN Cindy Knapp, who suggested the nurse file an iCare.[7] The nurse filed the iCare on June 24, 2020. Plaintiff testified that at the local improvement team meeting where the iCare was later discussed, Dr. Bain and Dr. Davis "ridiculed, belittled, and disparaged Sarah Wallace," who was not present at the meeting. Trial Tr. vol. 5, 1055:25-1056:6. Plaintiff testified that "they said Sarah Wallace is causing all - - everybody to gossip that there is actually a problem with NEC out there. They were angry at Sarah . . . ." *Id.* 1056:7-11. Dr. Bain and Dr. Davis responded to Wallace's concerns via email on June 26, 2020.[8] Trial Ex. 31.

Less than a week later, on June 29, 2020, plaintiff sent an email to the entire NICU staff, attaching an invoice for Prolacta. The email stated:

> Hi all,
> I thought it might be interesting for you to be aware of the cost of Prolacta. Below is a screen shoot [sic] of one bill I am approving.
>
> This knowledge aligns with our Packard Quality Management System principle Affordability[.]

Trial Ex. 36 at 5-6.

Shortly thereafter, plaintiff received an email from Olivia Mayer, head of nutrition for the

---

[7] Plaintiff testified that she and Knapp consulted about having Wallace file the iCare. Trial Tr. vol. 5, 999:4-19.

[8] At trial, Dr. Bain disputed any implication that she and Dr. Davis were upset about the Wallace iCare. Trial Tr. vol. 6, 1169:19-1170:10. The doctors testified that they thought they gave the iCare professional and considered treatment with their email response and that they subsequently held a town hall to hear the nurses' concerns on the issue. *Id.*; Trial Tr. vol. 4, 853:12-25.

United States District Court
Northern District of California

NICU.  Mayer asked why plaintiff had shared the Prolacta invoice and expressed displeasure at plaintiff having sent the email to the entire staff, "[e]specially without context[.]"  *Id.* at 5.  In her email, Mayer stated, among other things, "I'm sure the company would be very upset to know this information was given to the entire staff as I believe we get the biggest discount the company offers to any account."  *Id.*  Mayer sent her message to plaintiff, copying several other individuals, including Dr. Davis and Dr. Bain.

Following some back and forth between plaintiff and Mayer, Goldstein replied to the email thread on June 30 to say, "I would like to hold off on further e-mails related to this.  I think this needs to be in-person."  *Id.* at 2.  Shortly after, Dr. Bain chimed in as follows:

> Thanks Olivia for your email, I had similar questions.  And I agree Sheryl, that this needs to be an in person discussion.  The timing of the email and inclusion of only Prolacta +8 and cream in the context of the recent iCare feels very intentional.  I'd like to be a part of these discussions to further understand the goal of the email and the message we are sending our staff.  I'm free to meet Thursday and Friday this week, as well as Monday, Tuesday and Friday next week.  I'm happy to try and coordinate schedules if you can all send me some availability.  I think it's best we resolve this issue as soon as possible.  Thanks!
> Lisa

*Id.*

Plaintiff then forwarded Dr. Bain's email directly to Goldstein, copying Palmquist,[9] with the message: "Sheryl, That is a very accusatory email from Lisa below directly attacking my intentions to the whole group on the email!"  *Id.* at 1.  Sheryl replied,

> Hi Beth,
>
> I hear you [sic] concern.  Based on my conversation with Olivia on my way out today, the issues with the ICARE, how people are treating each other and issues around communicating are all playing into a lot of people's concerns.  E-mail is not the way to resolve these issues.

*Id.*

On July 1, 2020, Palmquist came to see plaintiff in person in her office.  Palmquist testified

---

[9] Palmquist was then in the role of plaintiff's supervisor's supervisor, as Associate Chief Nursing Officer overseeing the NICU.

at trial that he "wanted to know Beth's intention in sending that e-mail.  It seemed a little bit kind of out of the blue to me."  Trial Tr. vol. 3, 502:3-10.  During the meeting, Palmquist and plaintiff discussed the email, and plaintiff also spoke about Dr. Bain's behavior, and he agreed that what plaintiff was reporting was unprofessional.  At trial, Palmquist denied that plaintiff told him that Dr. Bain wasn't listening to plaintiff's "patient safety complaints."  *Id.* at 504:14-22.  Instead, he explained that what plaintiff reported was "just not [being] appreciated in her role, not supported, being talked over, that kind of thing.  She didn't express concerns about not being listened to with patient safety complaints."  *Id.* at 504:14-19.  He stated at trial that he did not recall NEC being discussed, in contradiction to his deposition testimony.

At his deposition, Palmquist recalled that NEC was part of the discussion that he had with plaintiff.  *See* Trial Tr. vol. 3, 508:11-509:16.  As recited at trial, Palmquist testified at his deposition as follows:

> **QUESTION**: Okay.  And in those concerns, did she mention the NEC situation with the back and forth of these letters and the iCare?
>
> **ANSWER**:    Yes.  I believe it was on the heels of Beth feeling mistreated, based on an e-mail response from Dr. Bain.  So that was part of the discussion.

*Id.* at 509:5-10.  He later explained at trial, "She wasn't - - we weren't discussing NEC.  We were talking about the Prolacta e-mail."  *Id.* at 523:1-8.  To his mind, they discussed NEC "associated with the Prolacta e-mail, yeah, one and the same. . . .  I don't recall specifically discussing NEC.  I remember talking about the Prolacta and the cost of Prolacta, and that whole dynamic."  *Id.* at 523:11-20; *see also id.* at 533:17-534:3.

After the July 1 meeting with plaintiff, Palmquist looped in his supervisor, Hella Ewing.  Palmquist reported at trial that he told his supervisor, "I talked to Beth about the timing [of the Prolacta email], and she admitted it - - it wasn't the best thing to do.  And then Beth went into lots of details around how Dr. Bain was disrespectful and the relationship wasn't good, and I wanted to make sure my boss was aware of Beth's concerns."  *Id.* at 509:17-510:9; *see also id.* at 583:7-19 (discussing Trial Ex. 41 at 1).  Palmquist also testified that during the July 1 meeting with plaintiff "[t]he only thing that caught my attention was her use of the words of a hostile workplace, at which

16

I felt obliged to share with my boss, which I believe we looked at that and I did." *Id.* at 522:18-23.

The trial exhibits showed that on the afternoon of July 1, Palmquist forwarded the Prolacta email

thread to Hella Ewing, stating, "I would like to dive into this issue between Beth and Dr. Bain as it

is really holding them back but wanted to ask if I should given the upcoming reporting changes?"[10]

*See* Trial Ex. 39 at 1.

Plaintiff recalls things somewhat differently. She testified that she went to Palmquist's

office at the end of June 2020, specifically to complain to him about NEC. She testified,

> So that's where I went and talked to him about, specifically about the
> increased incidence of necrotizing enterocolitis and the fact that the
> nurses -- the physicians were not listening to the nurses' concerns and
> that multiple nurses were telling me this, not just Sarah [Wallace], and
> Sarah was representing multiple nurses as well. She escalated to me
> and I escalated to Sheryl Goldstein and now Andrew Palmquist up the
> chain of command.
>
> I also talked to him about other issues in regards to unprofessional
> behavior with Dr. Bain and Alexis Davis. We talked about a few
> different things during that time, unplanned extubations. Like I said,
> the rate was better, but there were some barriers with Dr. Davis in
> regards to some of the changes we wanted to make to improve that.
> So.
>
> **Q.** Did you complain to Andrew [Palmquist] about health of the
> babies?
>
> **A.** Yes. Yeah, I mean, increased incidence of NEC. Yeah, we had one
> baby pass away and we had two who had to have surgical invention
> [sic]. And the nurse -- one of the nurses went home crying because
> they felt like they didn't speak up enough. . . .

Trial Tr. vol. 5, 976:13-977:18.

Palmquist testified that he did not recall a meeting with plaintiff in his office, and that the

meeting he recalls is the one that took place in plaintiff's office, after she sent the Prolacta email.

Trial Tr. vol. 3, 490:15-491:6. Palmquist also testified that when he met with plaintiff, she did not

raise patient safety complaints to him; rather, her complaints were about Dr. Bain's behavior. *See,*

*e.g., id.* at 581:21-582:6, 586:22-587:4. Goldstein testified that she did not have knowledge of

plaintiff ever going to Palmquist to complain. *Id.* at 441:11-21.

---

[10] Palmquist clarified at trial that "reporting changes" referred to the upcoming transition of
some of his duties to Luanne Smedley.

United States District Court
Northern District of California

In light of the testimony and the exhibits admitted at trial, the Court finds that the verdict was not contrary to the clear weight of the evidence. Although the Court's Statement of Decision did not address plaintiff's NEC theory of retaliation, evidence was presented at trial sufficient to support the finding that plaintiff did not prove by a preponderance of the evidence that she made complaints or reports regarding the quality of patient care. Her complaints to Palmquist in late June/early July 2020 related to Dr. Bain's unprofessional behavior and not to NEC specifically or to patient safety. Palmquist credibly testified that NEC was discussed only as ancillary to the "Prolacta email," the primary concern on plaintiff's end being Dr. Bain's public criticism of plaintiff on the email thread. In order to state a claim under Section 1278.5, there must have been notice to the employer, and no evidence aside from plaintiff's own trial testimony showed that Palmquist was on notice that plaintiff was blowing the whistle on a patient safety concern. *See Velente-Hook v. E. Plumas Health Car*e, 368 F. Supp. 2d 1084, 1102 (E.D. Cal. 2005) ("Without knowledge of the plaintiff's complaints, the defendant could not retaliate against the protected whistleblowing activity" under Section 1278.5).

The Court is particularly persuaded by two documents that plaintiff herself created: (1) a July 2 email from plaintiff to Palmquist memorializing their meeting from the prior day; and (2) the 28-page timeline that plaintiff sent to Joe Wilson in HR in August. *See* Trial Ex. 41 at 2; Trial Ex. 76 at 15-16. Neither document contains <u>any</u> mention of NEC. In the July 2 email, plaintiff thanks Palmquist for coming to meet with plaintiff "to show support for the situation with Lisa Bain" and elaborates on Dr. Bain's treatment of plaintiff.[11]   The timeline plaintiff sent to Wilson lists one

---

[11] The July 2, 2020 email from plaintiff to Palmquist reads, in full:

> Hi Andrew,
> I didn't get a chance to email yesterday and say thank you for coming by my office first thing in the morning to show support for the situation with Lisa Bain.
>
> When I came in yesterday I had intended to contact HR to get advise [sic] on how to deal with this ongoing hostile work environment that I feel Lisa has created. She is disrespectful to me in groups and undermines my leadership with NICU RNs and NICU leadership who I have worked hard to gain respect and trust from. Lisa is condescending in her communication to me and looks for whatever she thinks I am doing wrong and points it out. Not once has

United States District Court
Northern District of California

1    meeting with Palmquist in June 2020: "Met with Andrew as he was new to the ACNO role over the

2    NICU[.]"  *See* Trial Ex. 76 at 15.  Plaintiff's timeline further states, "Discussed my accomplishments

3    and at that time discussed issues with ongoing difficulties with Lisa Bain and unprofessional

4    behavior towards me and discussed several instances. [Next column.]  Andrew said he would help

5    provide support with this and to come and talk with him about it anytime I needed to."  *Id.*  On the

6    following page, the timeline discusses the June 24 iCare that Sarah Wallace filed, and the action

7    steps that plaintiff took in response.  *See id.* at 16.  Nowhere in the lengthy description does plaintiff

8    say that she raised Sarah Wallace's or her own NEC concerns to Palmquist.

9        The evidence suggests that, at the time these conversations were happening in late June and

10   early July 2020, neither plaintiff nor Palmquist understood these conversations to be about patient

11   safety concerns regarding NEC or feeding pathways.  As such, they were not reports or complaints

12   within the meaning of Section 1278.5.  Accordingly, plaintiff was not entitled to the rebuttable

13   presumption of retaliation around this incident.  Palmquist could not have retaliated against plaintiff

14   for making patient safety complaints when neither party to the conversation believed at the time that

15   these were complaints about patient safety.[12]

---

16   she recognized anything I have done here in the NICU.

17   Lisa is not open to my ideas and shuts me down in meetings
18   when I ask probing questions about concerns she brings up related to
19   nursing.

20   As I told you I feel attacked by her, targeted and that she aligns
     with others against me whenever possible.  I have several examples
21   and have shared all of them with Sheryl over the past year.  I have
     escalated this at every level.  Lisa has not once been held accountable
22   for her unprofessional behavior.

23   When you came by my office it gave me some hope that you
     may be able to begin to help work on this problem.  I want you to
24   know I appreciated the support.  This has been a large unnecessary
     amount of stress on an already difficult job to help turn the NICU
25   culture around and create a thriving environment for everyone.

26   [signature line omitted]

27   Trial Ex. 41 at 2.

28   [12] Though not dispositive, it is relevant that plaintiff appears to have believed at the time that
     she received the August 2020 PIP, at least in part, in retaliation for having applied for a promotion.

19

United States District Court
Northern District of California

#### d.     Aquadex Email

On November 2, 2020, plaintiff sent an email to Dr. Davis, copying NICU managers and several others (but not Sheryl Goldstein or Luanne Smedley) regarding the lack of trained nurses to staff "Aquadex."[13]  *See* Trial Ex. 114 at 3.  Aquadex was a new dialysis treatment for premature babies who had no kidneys.  *See* Trial Tr. vol. 4, 777:17-22.  As plaintiff's counsel described at trial, this treatment was for babies who were "the sickest of the sick."  *See id.*  Fewer than five hospitals in the country had Aquadex available at that point.  *Id.* at 826:24-827:2.  At the time of the email, the LPCH NICU had three babies on Aquadex, the highest number since the start of the program at LPCH.

On November 11, 2020, plaintiff was terminated.  Plaintiff's termination letter cites the Aquadex email as one of the examples of how plaintiff was not meeting performance expectations.  *See* Trial Ex. 130 at 1.  Plaintiff argues that with her November 2 email she was "sounding the alarm" about the hospital's inability to manage a fourth baby on Aquadex; that in fact, the hospital could barely manage the three Aquadex babies they already had; and that the administration was furious with her for blowing the whistle and attempting to stop a valuable experimental program that was generating money for the hospital.[14]

#### i.     The Aquadex Email Thread

The "Aquadex email" that plaintiff sent on Monday, November 2, read in full:

> Hi Alexis,
> At this time we do not have the capacity staffing wise to take additional babies that will be put on Aquadex.  We are working on a

---

On September 14, 2020, she emailed Wilson in HR regarding the iCare that she had just filed, adding: "Also a surprise PIP plan that Sheryl gave to me after I told her I had applied for a promotion within the organization.  Also, I read through my evaluation 3 weeks prior to my escalating unprofessional conduct of Lisa Bain and there was nothing that indicated a need for a PIP. . . ." Trial Ex. 233 at 4.

[13] By this point, Smedley had assumed Palmquist's role over the NICU and was therefore plaintiff's supervisor's supervisor.

[14] As noted in the Statement of Decision, there was no evidence introduced at trial regarding any financial gain the hospital got from running Aquadex.  *See* Dkt. No. 133 at 6.

1      plan to provide necessary training but for now we are having trouble
       accommodating 3 babies.

2      Thank you for your patience with us while we work out a plan.

3      Also, what is the expected time frame to run this 24/7?  Are you just
       waiting on trained RNs on night shift or is it dependent on Dialysis
4      department?  What are your thoughts?

5      [signature line omitted]

6  Trial Ex. 114 at 3.

7          Approximately 45 minutes later, Dr. Davis responded to the email thread, adding Sheryl

8  Goldstein and Luanne Smedley:

9

10     Beth-
       Based on your feedback I will let my faculty know to discuss any
11     prospective transports with nursing leadership before accepting an
       infant with renal failure who might require Aquadex.  This primarily
       would be infants who are not candidates for CVVH.  I have cc'd
12     Cynthia Wong, medical director for dialysis, to provide guidance on
       who this population would be- those less than 2kg but greater than
13     1.2ish kg?  We do have a RAFT trial patient in the pipeline who is
       still periviable, so not yet a candidate for Aquadex, and so we will
14     need to monitor our staffing continuously and our current patients'
       ability to transition to peritoneal dialysis as the fetus enters a
15     potentially eligible time window and be able to accommodate those
       already within our system.
16
       As we discussed at NICU ops last week, there is a goal to be able to
17     transition to doing Aquadex 24/7 so that we can more evenly diurese
       these patients without confronting hemodynamic instability.  This is
18     analogous to how we do CVVH, with our nurses feeling comfortable
       interacting with the machine as changes are needed in real time to
19     make adjustments, but having the support of the on call dialysis staff.
       The hope during this period where we have an abundance of patients,
20     we would be able to better familiarize the night staff who received
       didactic training and get them up and running.  Perhaps Dr. Wong's
21     dyad partner in the dialysis center can work with you on how to plan
       the interface between dialysis support on night shift to help with this
22     just in time education.  Whether we need to train additional nurses to
       ensure that we have an adequate pool to prevent burnout, I will defer
23     to you and the nursing leadership.

24     Including Luanne and Sheryl for situational awareness as it relates to
       the transfer center requests.
25
       [signature line omitted]
26
   Trial Ex. 144 at 2-3.
27
           Thirty minutes after Dr. Davis sent her email, Smedley forwarded the email to Goldstein,
28

United States District Court
Northern District of California

stating:

> Sheryl,
> Were you aware of this before she sent this to Alexis?  This is
> concerning.
>
> Can you also set up time to discuss her PIP?

*See id.* at 2.  In Goldstein's reply, she indicated that she and plaintiff spoke briefly about the lack of Aquadex trained nurses on Friday (i.e., three days earlier).  Goldstein indicated that plaintiff "told me about the concern for the number of dialysis patients that we are getting because of the [Aquadex] trial."  *Id.*  Goldstein also stated that she had planned to discuss the matter with Smedley that day (Monday, November 2), but that she had wanted to check in with Dr. Davis first.  *Id.*

### ii.        Dr. Davis's Testimony

Dr. Davis testified at trial that before plaintiff sent the Aquadex email, Dr. Davis actually proactively initiated a discussion with plaintiff whether they had adequate trained nurses to staff the Aquadex machine.  Trial Tr. vol. 4, 884:22-885:21.  Dr. Davis testified that she did not understand the Aquadex email to be a "complaint of unsafe patient care that Ms. Falkner [sic] was raising[.]" Trial Tr. vol. 5, 937:2-7.  When asked what the Aquadex email was, Dr. Davis testified, "This was in response to me approaching her to understand if we had adequate specialty staffing to potentially take another baby.  Should the circumstance arise, I wanted to be, I wanted to plan ahead and be proactive so that if my faculty received a call with a request to transport a baby for this therapy, we could safely do it."  *Id.* at 937:8-11.  From Dr. Davis's perspective, the email was plaintiff "responding to a verbal discussion that we had" about the issue.  *Id.* at 938:2-5.  Dr. Davis copied Smedley and Goldstein on the Aquadex email to make them aware that "if we got a call based on Ms. Falkner's [sic] guidance that we could not accept a fourth baby, I wanted them to be aware that we might have to say 'no' so that we could safely take care of the three babies that we already had. And at that time, Ms. Smedley was over [i.e., in charge of] the transfer center."[15]  *Id.* at 938:10-939:1.

---

[15] There was testimony at trial that Aquadex was not used just for babies who were already at LPCH, but that babies who needed Aquadex might be transferred to LPCH from other hospitals, since LPCH was one of the few hospitals with this new machine.

United States District Court
Northern District of California

### iii.      PIP and Termination Letter

On November 8, 2020, Goldstein sent Smedley and Wilson a document titled "BF PIP update 11.2.20." Trial Ex. 118 at 1. On November 9, Smedley replied with her edits to the document, stating, "FYI – added items in red." Trial Ex. 266 at 1. Among the items that Smedley added to the PIP update are the below additions (in bold) regarding the Aquadex email:

> Prioritize work to focus on top priorities such as HACs, safety, Packard 3.0, staffing (productivity and support) and unit culture work-
> . . .
> It was recommend**ed** that you share emails and continue to seek guidance before sending emails **which you have not done**. A recent example where this would have been beneficial, was the email notifying Dr. Davis about the inability to take more than 3 Aquadex patients due to staffing/training. Although we briefly discussed this issue on the Friday before the email was sent, I was not aware of what would be included in the e-mail. Luanne Smedley and I became aware of the email because we were cc'd by Dr. Davis when she responded to your email. **Completely stopping a program without consulting me is not appropriate decision making or communication on your part.**

*Id.* at 3.

No updated PIP was ever given to plaintiff because plaintiff was terminated instead. The termination letter, signed by Goldstein, cited the Aquadex email. In relevant part, the letter stated:

> . . . Unfortunately, your work performance continues to fall short of the expectations required for your position in the following key areas:
> . . .
>
> **Communication skills, including both the ability to communicate appropriate information to staff and leadership and to check if information should be shared.** It was recommend [sic] that you share emails with me and continue to seek guidance before sending emails. A recent example where this would have been beneficial, was the email notifying Dr. Davis about the inability to take more than 3 Aquadex patients due to staffing/training. Although we briefly discussed this issue on the Friday before the email was sent, I was not aware of what would be included in the e-mail. Luanne Smedley and I became aware of the email because we were cc'd by Dr. Davis when she responded to your email. Stopping a critical program due to staffing without proper communication to your director and ACNO is lacking understanding of the gravity of your communication and this situation in general.

Trial Ex. 130 at 1-2.

### iv.     Ms. Smedley's Reaction

It is clear, both from the replies to the email thread and the testimony at trial, that the Aquadex email prompted Smedley to check in with Goldstein on the progress of plaintiff's PIP.[16] When asked what the connection was between the Aquadex babies and a PIP, Smedley testified, "Stopping a program - - stopping a strategic program without vetting that decision with the appropriate stakeholders is a very concerning issue."  Trial Tr. vol. 4, 783:13-21.  In emails directly with Goldstein on the afternoon that plaintiff sent the Aquadex email, Smedley stated,

> You and me……to review her PIP and see where she is on progress.
>
> It is concerning to me that she sent an email to Alexis re: the lack of staffing for these patients that would have an impact on transfer center patients potentially, and didn't cc you on that email. (or me for that matter)  These are significant decisions that she seemingly doesn't understand the impact of.  Why hasn't she moved on the planning sooner?

Trial Ex. 114 at 1.  Smedley testified at trial that plaintiff stopped the Aquadex program, by effectively telling the transfer center not to accept any new babies.  Trial Tr. vol. 4, 771:2-19.  Smedley later conceded that the program never actually stopped.  *Id.* at 774:4-5.  When questioned at trial, Smedley stated she had three concerns with plaintiff's Aquadex email: (1) that plaintiff "did not understand the impact of unilaterally stopping a program - - a premier program that Packard Children's Hospital has for Aquadex patients[,]" and that the decision not to take more patients through the transfer center needed to involve other stakeholders; (2) communication, in that plaintiff did not copy Smedley, Goldstein, or the medical director of the dialysis unit on the email; and (3) advance planning, in that Smedley said it was plaintiff's "responsibility to ensure we have appropriate staffing and appropriately trained nurses[,]" and Smedley wanted to know how the NICU even got into the situation of not having enough trained nurses to run Aquadex.  *Id.* at 826:20-827:21.  Smedley testified that the Aquadex situation was "absolutely" one of the reasons that

---

[16] The 60-day time period for plaintiff's PIP, which she signed on August 28, 2020, would have run on October 27, 2020.  There was testimony from plaintiff and Goldstein at trial that nothing happened on October 27, and no one checked in with plaintiff about the status of her PIP on or around that date.  The various witnesses disputed what the effect of this was, whether it meant that the PIP lapsed or that it remained in effect.

1    Smedley decided to terminate plaintiff rather than extend the PIP. *Id.* at 827:22-828:4.

2

3                          **v.       Ms. Goldstein's Testimony**

4           Ms. Goldstein testified at trial that she did not interpret plaintiff's Aquadex email to be a

5    "complaint."  She said that the Aquadex "e-mail itself was not a reason to terminate Beth" and that

6    in the termination letter "there are other sources of issues that came up around communication,

7    collaboration[.]" Trial Tr. vol. 3, 471:14-23.  Goldstein conceded at trial that the letter was incorrect,

8    in that plaintiff never "stopped" the Aquadex program. *Id.* at 474:11-23.

9

10                          **vi.      Plaintiff's Testimony**

11          Plaintiff testified at trial that she "most definitely" considered her email to Dr. Davis on

12   November 2 to be a complaint about patient safety.  Trial Tr. vol. 5, 988:22-25.  The trial testimony

13   is somewhat unclear, but it appears that plaintiff described a situation during the weekend prior to

14   the November 2 (Monday) email, in which Diana Powell, the head of the dialysis patients for the

15   NICU, and plaintiff herself came in to give the Aquadex nurses breaks.  This was the first time the

16   NICU had had three babies on Aquadex, and it wasn't safe for the nurse staffing the machine to

17   leave the babies alone even for the nurse to use the restroom.  The "charge" nurses were not qualified

18   to sit with those babies.  *Id.* at 987:19-988:21.  Plaintiff testified that the situation didn't feel safe.

19   *Id.* at 988:15-21.

20

21                          **vii.     Analysis**

22          The Aquadex situation is where plaintiff's case is strongest.  However, on balance, the Court

23   cannot find that the verdict was based on error of law or fact or was contrary to the weight of the

24   evidence.  It is clear that plaintiff, with hindsight, now strongly believes that she was sounding the

25   alarm on a patient safety issue when she sent the Aquadex email.  But there was no evidence at trial,

26   *apart from plaintiff's own trial testimony*, to show that anyone else perceived it that way.  To the

27   contrary, the evidence showed that plaintiff and Dr. Davis were actually on the same page about the

28   Aquadex issue in the days leading up to the email.  Plaintiff and Dr. Davis had had ongoing

United States District Court
Northern District of California

discussions about the lack of trained nurses for Aquadex, and both wanted to be prepared and to alert others in case LPCH was asked to accept a fourth baby for the program. Plaintiff orally looped Goldstein into this situation on the Friday before the email went out on Monday. It makes little sense that plaintiff would have been "sounding the alarm" about the Aquadex program but didn't include any of her superiors on the email.[17]

Smedley's reaction did not help defendant's situation. Smedley was not in the loop on the Aquadex discussions that took place before the weekend, and it appears she misinterpreted plaintiff's email as trying to stop the Aquadex program (rather than plaintiff proactively responding to a conversation that she and Dr. Davis had, as Dr. Davis credibly testified). Smedley cited this as yet another example of plaintiff's lack of communication skills, especially when it came to email (recall the Prolacta email incident four months prior) and of plaintiff's poor judgment about who needed to be involved in conversations of significant import. "Communication and Collaboration" was the first "Area of Concern" listed on plaintiff's PIP. *See* Trial Ex. 95 at 1. The Aquadex email prompted Smedley to check in on the status of the PIP, which had lapsed or expired the week before, without anything happening. But Smedley's misunderstanding of the context for the Aquadex email does not dictate a different result in this case. No evidence, direct or circumstantial, showed that Smedley thought plaintiff was blowing the whistle on unsafe conditions so much as that Smedley thought plaintiff was making a mess of a situation that was partly plaintiff's fault (in Smedley's view, whether accurate or not) for not having enough trained nurses to run Aquadex.

### e.    Conclusion

In sum, it was plaintiff's burden to prove her prima facie case at trial. Based on the evidence presented, the Court will not disturb its prior finding that plaintiff failed to prove by a preponderance of the evidence that she made a complaint or grievance regarding "suspected unsafe patient care and conditions" or "related to the quality of care, services, or conditions" at LPCH, to trigger the protections of Section 1278.5. *See Shaw*, 2 Cal. 5th at 995-96 (quoting Cal. Health & Safety Code

---

[17] It was explained at trial that the doctors were employed by a separate entity from LPCH and did not have supervisory authority over plaintiff.

§ 1278.5(a), (b)(1)).  First, plaintiff's complaints about Dr. Bain's unprofessional conduct were not, based on the evidence presented at trial, about the quality of patient care.  Second, the evidence did not support plaintiff's assertion that the hospital put her on a PIP in August 2020 in retaliation for concerns plaintiff raised to Palmquist regarding NEC.  The evidence showed that both plaintiff and Palmquist understood their conversations at that time to be about Dr. Bain's lack of professionalism toward plaintiff and not about suspected unsafe patient care or conditions.  And third, the evidence at trial did not show that plaintiff's superiors at the hospital interpreted her November 2, 2020 Aquadex email as a complaint about the quality of patient care.  Rather, plaintiff's supervisor's supervisor (Smedley) viewed the email as another indicator of how plaintiff was failing to meet expectations as a manager, especially regarding communication with stakeholders.  Whether or not plaintiff's superiors were correct in their assessment is not the question.  What matters is that the evidence did not show that they understood the Aquadex email to be a patient safety complaint.

For these reasons, the Court does not address plaintiff's remaining arguments in her motion regarding her entitlement to the rebuttable presumption and whether or not she was terminated for "poor performance."  The rebuttable presumption applies once there has been a legally protected complaint.  Based on the above findings, and as already stated in the Court's prior order, Dkt. No. 133 at 4-6, plaintiff would not have been entitled to the rebuttable presumption.

Accordingly, the Court DENIES plaintiff's motion to alter/amend its findings or for a new bench trial on her statutory claim for violation of Health and Safety Code section 1278.5.

## II.    Motion for Relief on Jury Trial Claim

Plaintiff raises several arguments in support of her motion to vacate the judgment and for a new trial on her jury claim of wrongful discharge in violation of public policy.  She argues that she is entitled to a new trial based on: juror misconduct, erroneous jury instructions, defendant's discovery misconduct, and the verdict being against the weight of the evidence.

### A.    Alleged Juror Misconduct

Plaintiff argues that the foreperson of the jury, C.W., knew plaintiff's counsel (Angela

Alioto) from prior litigation but did not disclose this information in voir dire or at any time until after the verdict was rendered.  Dkt. No. 139 at 10-12.  Plaintiff states that the truth came out during a conversation with C.W. in the hallway outside the courtroom following the jury's dismissal.  Dkt. No. 139-2 (Alioto Decl.) ¶¶ 2-7.  Defendant argues that LPCH's counsel observed the interactions with the jurors after trial and that plaintiff's legal team used this as an opportunity to "confront" the jury and ask argumentative questions about the verdict.  Dkt. No. 158-3 (Bruno Decl.) ¶ 3. Defendant also argues that plaintiff has waived her right to challenge C.W. as a juror because C.W. disclosed her employment history on her jury questionnaire and plaintiff's counsel did not question her further or challenge her presence on the jury.  *See* Dkt. No. 158-2 at 3.  In reply, plaintiff's counsel states that she has litigated hundreds of lawsuits during her career and that she cannot be expected to have mentioned in voir dire all of the various employers she has sued.  Dkt. No. 162-1 (Alioto Reply Decl.) ¶ 11.  She also vigorously disputes defendant's characterization of the post-trial conversation with the jurors.[18]

### 1.      Background

#### a.      Voir Dire

The Ninth Circuit has explained that "when the issue of bias arises after trial . . ., dishonesty in voir dire is the critical factor."  *Fields v. Brown*, 503 F.3d 755, 772-73 (9th Cir. 2007).

On February 1, 2023, at the beginning of jury selection, the Court stated, "So to begin with, I want to ask the parties and the lawyers to reintroduce themselves.  We do this so that if any of you folks know the lawyers or know the parties, we can find that out now."  Trial Tr. vol. 1, 22:11-14 (Feb. 1, 2023).  Ms. Alioto introduced herself.  None of the potential jurors indicated they knew the attorneys or the parties.

The Court later asked, "Have any of you or your close family or friends ever been involved in litigation having to do with employment?  Either -- well, any kind of things related to employment

---

[18] Plaintiff also states that C.W. did not timely submit her jury questionnaire online, though plaintiff does not dispute that she had a hard copy of C.W.'s handwritten answers to the questionnaire in the morning before jury selection began.

in the litigation context, you or your close family or friends?" *Id.* at 38:20-24. Several members of the jury panel spoke up, but C.W. did not.

Later in the proceedings, plaintiff's counsel (Jordanna Thigpen) asked, "I'm going to ask this generally -- well, first of all, did anyone else have an experience -- anyone at all in the room have an experience where they were a supervisor and they participated in a situation at work where they were accused, possibly, of something, whether you did it or you did not do it?" *Id.* at 62:3-8. No one raised their hand. Counsel then followed up, "Anyone at all have any human resources experience like that as a supervisor?" *Id.* at 62:10-11. C.W. raised her hand, and the following exchange took place:

> C.W.: I was a supervisor who had to terminate an employee. So it wasn't against me, but...
>
> MS. THIGPEN: Okay. And based on that experience, do you think that you are more likely to be biased as an employer or as a supervisor than you would if you were an employee?
>
> C.W.: No. I would base my decision on the evidence at hand.
>
> MS. THIGPEN: Thank you.

*Id.* at 62:14-20. Plaintiff's counsel asked no more follow-up questions of C.W.

### b.    Conversations with C.W.

The day after the jury returned its verdict, Ms. Alioto filed a declaration describing a conversation she had with C.W. outside the courtroom after the jury had been dismissed. Dkt. No. 127. To briefly restate, Ms. Alioto reports that after an initial exchange regarding the verdict--

> [C.W.] then stated, "You know, Ms. Alioto, I know you, I know you very well". A little startled, I said, "You do?" she said "Yes, I know you, you represented a employees [sic] that we fired when I was a manager at Bayer Pharmaceutical". I then stated that I remembered the Bayer case. I remember that I had actually gone to the Bayer Headquarters workplace in Berkeley during the litigation several years ago. She then said, "yes, that is right I remember you came, and you won, and you won and you won".

*Id.* ¶ 4. Ms. Alioto states that she responded, "feeling a little uneasy 'I am glad to hear' and I stopped talking about the Bayer case because [C.W.] had clearly become agitated." *Id.* ¶ 5. Ms. Alioto

declares, "I then stated to her that the Judge still has the equitable part of the case to decide. [C.W.], clearly upset, stated, 'well the Judge can't change anything'. I informed her that the Judge does not change anything but that there is a separate cause of action for whistleblowing." *Id.* ¶ 6.  C.W. responded, "'Well, good luck with that' and walked away." *Id.* ¶ 7.  In a subsequent declaration attached to the motion for a new trial, Ms. Alioto states that she filed three cases against Bayer between 2005 and 2007.  Dkt. No. 139-2 ¶ 8.

The day after the jury verdict, the parties' counsel spoke by phone.  Ms. Alioto alerted defense counsel to the conversation she had with C.W.  Following that call, Mr. Bruno, trial counsel for defendant, found contact information for C.W. online.  He sent a text message to the phone number, stating,

> Hello.  This is attorney Michael Bruno from the Faulkner trial in federal court.  I am trying to reach [redacted], and I found this number on the Internet. If this is [redacted]'s cell phone, I would appreciate it if she would call me back.  Briefly, Ms. Faulkner's attorneys are trying to demand a new trial because they told us that [redacted] withheld information from the court about knowing opposing counsel.  And if this is not [redacted]'s cell phone, if you could just shoot me a quick note back so indicating, I would greatly appreciate it.  Thank you, Michael Bruno [number redacted]

Dkt. No. 158-4, Bruno Decl., Ex. A.  Mr. Bruno states that C.W. then left him a voicemail on his cell phone, in which she stated, in part, "I did not know opposing counsel.  I just knew of her." Dkt. No. 158-4, Bruno Decl., Ex. B.  Mr. Bruno then spoke with C.W. by phone and sent her a text message afterwards:

> Ms. [redacted]
> Thank you again for talking to me this afternoon.
>
> In order to nip this in the bud, I would like to prepare a short statement that indicates that you had never seen Ms. Alioto before the trial, had never communicated with her, and that what you knew of her family was just a result of your having lived in the Bay Area.
>
> Do you have an email address to which I could send this?

Dkt. No. 158-4, Bruno Decl., Ex. D.  Mr. Bruno later sent another text message to C.W. indicating that he would await further direction from the Court before asking C.W. to sign a statement.  *Id.*

2.      **Evidentiary Hearing**

In her motion, plaintiff requested an evidentiary hearing with C.W.  The Court granted that request and held the hearing on August 22, 2023.  The Court questioned the juror, with input from counsel for both parties.  Dkt. No. 171.  C.W. testified under oath that she worked for Bayer for 37 years, from 1983 to 2021, including as a quality assurance supervisor.  She testified that she had never seen Ms. Alioto until the morning of her jury service in this case.  C.W. stated that she did not "know" Ms. Alioto but only "knew of" her and her family because of their involvement in politics in San Francisco, where C.W. was born.  C.W. further testified that she did not supervise, hire, or fire any of the three employees whom Ms. Alioto identified as having previously represented in employment lawsuits against Bayer.[19]  C.W. did state that she knew a different former employee (S.S.) who successfully pursued a wrongful termination suit against Bayer and who was represented by Ms. Alioto.  While S.S. at one point worked for C.W., C.W. did not supervise S.S. at the time that S.S. was terminated.  C.W. was not involved in that litigation, as a witness or otherwise, and she testified that it in no way impacted her jury service here.  C.W. recounted one instance in which she had to terminate an employee for performance-related reasons, but that employee did not sue Bayer, as far as C.W. is aware.  During her time at Bayer, C.W. was never personally involved in any of the employment litigation, either as a consultant, witness, or otherwise.  She testified that she did not feel a particular allegiance toward Bayer or concern regarding lawsuits filed against it during her time with the company, explaining that Bayer "is a huge company" and that sometimes they were in the right and sometimes they were in the wrong.  C.W. also testified that she neither felt intimidated by plaintiff's counsel during the post-trial discussion in the hallway, nor did she feel intimidated or browbeaten by defense counsel when he contacted her to follow up.

3.      **Analysis**

In her papers, plaintiff argues she is entitled to a new trial because juror C.W. displayed three types of bias: "so-called *McDonough*-style bias,[] which turns on the truthfulness of a juror's

---

[19] As to two of those individuals, C.W. testified that she did not know them at all.  As to the third, she testified that the name sounded familiar, but she couldn't say whether she knew them.

United States District Court
Northern District of California

responses on voir dire; actual bias, which stems from a pre-set disposition not to decide an issue impartially; and implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury."  *See Fields*, 503 F.3d at 766.

### a.  *McDonough*-Style Bias

In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), the Supreme Court held that a party may be able to obtain a new trial if the party can "first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause."  Here, the evidence shows that C.W. did not lie in *voir dire*.  C.W. disclosed her prior employment with Bayer in her jury questionnaire.  She stated in *voir dire* that she was a former supervisor who once had to fire someone.  She consistently testified in *voir dire* and at the evidentiary hearing that the experience of terminating someone did not bias her one way or another in this case.  (In *voir dire*, this exchange occurred during plaintiff's counsel's questioning.  Counsel did not ask further follow-up questions).  And the Court finds that it was not a lie for C.W. to refrain from raising her hand in *voir dire* when the Court inquired whether any potential juror "knew" any of the attorneys or parties.  C.W. credibly testified at the evidentiary hearing that she did not "know" Ms. Alioto in any direct sense.  Instead, C.W. explained that she "knew of" her because Ms. Alioto is from a prominent political family in San Francisco and because Ms. Alioto represented a former Bayer employee in an employment action in which C.W. was not involved.[20] [21]

---

[20] The Court *sua sponte* takes judicial notice of the undisputed fact that Ms. Alioto's father, Joseph L. Alioto, was formerly Mayor of San Francisco.

[21] Even if C.W. should have disclosed that she "knew of" Ms. Alioto, that would not necessarily warrant a new trial.  The Supreme Court has "held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality."  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) (citing *McDonough*, 464 U.S. at 555-56); *see also Fields*, 503 F.3d at 767 (explaining that the juror in question "did not fail to volunteer details for any reason that implicated impartiality; he would have furnished them, if asked.  But he wasn't asked, and in these circumstances we heed *McDonough*'s admonition not to invalidate the result of a trial.").

United States District Court
Northern District of California

1    The Court finds there was no *McDonough*-style bias in this case.

2

3                    **b.    Actual Bias**

4    The Ninth Circuit has explained that actual bias can be termed "'bias in fact'-the existence

5    of a state of mind that leads to an inference that the person will not act with entire impartiality. . . .

6    Actual bias is typically found when a prospective juror states that he can not be impartial, or

7    expresses a view adverse to one party's position and responds equivocally as to whether he could

8    be fair and impartial despite that view." *Fields*, 503 F.3d at 767 (citations omitted).  Actual bias

9    does not apply in this case.  C.W. never stated, in *voir dire* or at the evidentiary hearing, that she

10   could not be impartial in this case, nor did she express a view adverse to plaintiff's position or

11   respond equivocally to questions regarding potential bias.  Instead, C.W. consistently and credibly

12   testified that she could determine the issues in the present case based on the facts at hand and that

13   she did not harbor a particular bias one way or another because of her former work as a supervisor

14   at Bayer.

15

16                    **c.    Implied Bias**

17   Reported cases have rarely found implied bias.  *See Fields*, 503 F.3d at 768 (explaining that

18   "the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied bias" and that

19   "our court has inferred or presumed bias on rare occasions") (citations omitted).  It is not enough

20   for the trial to involve a similar set of facts to something that the juror has personally experienced,

21   where the juror has provided an honest (even if incomplete) disclosure on *voir dire*.  *See id.* at 773.

22   Examples of cases where the Ninth Circuit has found implied bias include: a case involving two

23   jurors who were employees (at a different branch) of the bank that was robbed, *United States v.*

24   *Allsup*, 566 F.2d 68 (9th Cir. 1977); and a heroin conspiracy case, in which a juror failed to disclose

25   that two of his children were in prison for heroin-related crimes, *United States v. Eubanks*, 591 F.2d

26   513 (9th Cir. 1979).

27   Here, the Court finds no indicia of implied bias.  The defendant in this case was a hospital;

28   C.W. previously worked for a pharmaceutical company.  C.W. recounted only one instance of

*United States District Court*
*Northern District of California*

having terminated a former employee, which did not result in litigation; and one instance of knowing about a former employee represented by Ms. Alioto, where C.W. had no connection to the litigation. Neither of these comes close to the level of connection to the parties or to the facts of the case that led the Ninth Circuit to infer bias in *Allsup* and *Eubanks*.  Nor is there any indication that C.W. "repeatedly lied about a material fact to get on the jury." *See Fields*, 503 F.3d at 766.

In sum, having reviewed the declarations filed by counsel and having examined the jury foreperson under oath, the Court concludes that no juror misconduct or bias warrants a new trial.

### B.    Jury Instructions

Plaintiff also challenges the jury instructions.  She argues first that she was entitled to the rebuttable presumption in Health and Safety Code section 1278.5, and so the Court should have given Plaintiff's Special Instruction No. 1 or similar instruction that incorporated the presumption. Second, she argues that limiting Instruction No. 22A was prejudicial because, in telling the jury that "[t]he question of whether LPCH discharged Ms. Faulkner in retaliation for presenting a complaint or report about 'hostile work environment' is not before you," the Court undermined plaintiff's theory of the case that her complaints about unprofessional conduct *were* complaints about patient safety.  Third, she argues the jury should have been given Special Instructions 3-5, which are California laws that plaintiff says provide context for her medical whistleblowing complaints.  *See* Dkt. No. 162-2 (Thigpen Reply Decl.), Ex. 1.

Defendant argues: (1) there was no error because the jury was not deciding the Section 1278.5 claim, and plaintiff waived her right to object because she agreed to the wrongful discharge instruction the jury received; (2) there is no error because the Court modified Instruction No. 22A to remove reference to "unprofessional behavior," and plaintiff's advocacy at the instruction conference shows that she understood "hostile work environment" and "unprofessional behavior" were separate concepts; and (3) plaintiff didn't reference these California laws in her complaint and so defendant didn't have chance to defend itself with regard to allegations the hospital violated these laws.

In diversity actions such as this one, courts "look to state law for the correct substance of

jury instructions, [but] the question whether an incorrect instruction is prejudicially erroneous is a procedural one requiring application of federal law." *Pollack v. Koehring Co.*, 540 F.2d 425, 426 (9th Cir. 1976) (citations omitted).  Federal courts must ask "whether, looking to the instructions as a whole, the substance of the applicable law was fairly and correctly covered." *Id.* (citation omitted).

### 1.    Rebuttable Presumption (Plaintiff's Proposed Special Instruction No. 1)

California Health and Safety Code section 1278.5, which protects whistleblowers in health facilities, contains the following rebuttable presumption:

> There shall be a rebuttable presumption that discriminatory action was taken by the health facility, or by the entity that owns or operates that health facility, or that owns or operates any other health facility, in retaliation against an employee, member of the medical staff, or any other health care worker of the facility, if responsible staff at the facility or the entity that owns or operates the facility had knowledge of the actions, participation, or cooperation of the person responsible for any acts described in paragraph (1) of subdivision (b),[] and the discriminatory action occurs within 120 days of the filing of the grievance or complaint by the employee, member of the medical staff or any other health care worker of the facility. .  .  .

Cal. Health & Safety Code § 1278.5(d)(1).

The statute further states that "[t]he presumptions in subdivisions (c) and (d) shall be presumptions affecting the burden of producing evidence as provided in Section 603 of the Evidence Code."[22]   Evidence Code section 603 in turn states, "A presumption affecting the burden of producing evidence is a presumption established to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied." Cal. Evid. Code § 603.

Plaintiff argues that it was error for the Court not to incorporate the rebuttable presumption of Section 1278.5 into the wrongful discharge instruction that went to the jury, either by giving plaintiff's proposed Special Instruction No. 1 or something similar.  *See* Dkt. No. 113 (Pl.'s Proposed Jury Instructions) at 43.

---

[22] The presumption in subdivision (c) relates to discriminatory action against patients rather than employees.

In 2017, the California Supreme Court clarified that a cause of action arising under Health and Safety Code section 1278.5 is to be tried by a court rather than a jury. *Shaw*, 2 Cal. 5th at 1003. Prior to that decision, however, the Judicial Council of California published a model jury instruction for a cause of action brought under Section 1278.5. Though since revoked pursuant to *Shaw*, the model instruction contains useful information regarding the operation of the rebuttable presumption under California law. In the "Directions for Use," it states:

> There are rebuttable presumptions of retaliation and discrimination if acts are taken within a certain time after the filing of a grievance. (See Health & Saf. Code, § 1278.5(c), (d).) However, these presumptions affect only the burden of producing evidence. (Health & Saf. Code, § 1278.5(e).) A presumption affecting only the burden of producing evidence drops out if evidence is introduced that would support a finding of its nonexistence. (Evid. Code, § 604.) Therefore, *unless there is no such evidence*, the jury should not be instructed on the presumptions.

Judicial Council of Cal. Civil Jury Instruction 4606 (2017 ed.) (emphasis added).

This is consistent with the California Evidence Code, which explains what it means for a presumption to affect the burden of producing evidence:

> The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact *unless and until* evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and *without regard to the presumption*. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate.

Cal. Evid. Code § 604 (emphases added). In her motion, plaintiff quotes from the Law Commission Comment to Evidence Code section 604, *see* Dkt. No. 139 at 26, but she omits the immediately preceding sentences. The omitted portion of the Comment states:

> If a presumption affecting the burden of producing evidence is relied on, the judge must determine whether there is evidence sufficient to sustain a finding of the nonexistence of the presumed fact. If there is such evidence, the presumption disappears and the judge need say nothing about it in his instructions. If there is not evidence sufficient to sustain a finding of the nonexistence of the presumed fact, the judge should instruct the jury concerning the presumption.

Cal. Evid. Code § 604, Comment—Assembly Comm. on Judiciary.

United States District Court
Northern District of California

Here, even assuming that plaintiff had made a complaint about suspected unsafe patient care or conditions within 120 days of any alleged retaliation, defendant introduced evidence sufficient to sustain a finding of the nonexistence of a retaliatory motive.  The Court previously addressed this in its Statement of Decision.  *See* Dkt. No. 133 at 6-7.  There was evidence introduced at trial sufficient to sustain a finding that plaintiff was terminated for her performance and not as retaliation for whistleblowing.  Where such evidence is introduced, the jury should not be instructed on the presumption.  *See* Judicial Council of Cal. Civil Jury Instruction 4606 (2017 ed.); *see also* Cal. Evid. Code § 604, Comment—Assembly Comm. on Judiciary.[23]

### 2.  Hostile Work Environment (Instruction No. 22A)

Plaintiff argues that limiting instruction No. 22A was erroneous and prejudicial.  Plaintiff argues that this "instruction to the jury to disregard any complaints of 'hostile work environment' (Jury Instruction No. 22A) amounted to an instruction to the jury that all of Plaintiff's complaints about the doctors' unprofessional conduct, or anything about their behavior – including their retaliatory conduct—did not constitute suspected unsafe patient care, services, or conditions."  Dkt. No. 139 at 28-29.  Plaintiff's theory of the case was that her "complaints of a 'hostile work environment' (the doctors' unprofessional conduct) constituted complaints of suspected unsafe patient care, services, and conditions . . . ."  *Id.* at 27-28.

At trial, the jury was instructed on the elements of wrongful discharge in violation of public policy (Instruction No. 22).  Dkt. No. 119 at 13.  The jury also received Instruction No. 22A, titled "Further Explanation of Wrongful Discharge in Violation of Public Policy":

> The claim before you is for wrongful discharge in violation of public policy.  It is based on an allegation that LPCH discharged Ms. Faulkner in retaliation for presenting a complaint or report about unsafe patient care, services, or conditions at LPCH, to LPCH or its medical staff.  In this trial, you have heard mention of "hostile work environment."  The question of whether LPCH discharged Ms. Faulkner in retaliation for presenting a complaint or report about

---

[23] The Court also finds that plaintiff's Special Instruction No. 1 should not have been given for other reasons, including that it includes the clearly erroneous statement that defendant could only rebut the presumption by showing that plaintiff "did not present a complaint or report to LPCH or its medical staff" at all.  *See* Dkt. No. 113 at 43.

1
2

> "hostile work environment" is not before you.  Rather, the question is
> whether LPCH discharged Ms. Faulkner in retaliation for presenting
> a complaint or report about unsafe patient care, services, or conditions
> at LPCH, to LPCH or its medical staff.

3   *Id.* at 13-14.

4   On its face, the instruction does not do what plaintiff argues it does.  That is, the instruction

5   does not tell the jury that complaints of unprofessional conduct do not or cannot constitute

6   complaints about unsafe patient care, services, or conditions.   As explained during the jury

7   instruction conference, the Court was concerned that the repeated use at trial of the term "hostile

8   work environment" would confuse the jury as to what the whistleblowing statute at issue concerns.[24]

9   The original draft of Instruction No. 22A referenced both "hostile work environment" and

10   "unprofessional conduct."   In response to plaintiff's concerns that this would undermine her

11   retaliation theory, the Court deleted reference to "unprofessional conduct."  Trial Tr. vol. 7, 1307:7-

12   1331:17 (Feb. 10, 2023); *see also id.* at 1309:9-1310:14 (plaintiff's counsel arguing, *inter alia*, "In

13   my view, if you are going to give an instruction regarding a hostile work environment, the hostile

14   work environment is appropriate.  'You may have heard mention of hostile work environment,'

15   period.  You know, the question of whether LPCH discharged Ms. Faulkner in retaliation for

16   presenting a complaint about a hostile work environment.  Okay?").  Plaintiff's counsel was free to

17   argue to the jury, and did, that the unprofessional conduct of the doctors in the NICU created patient

18   safety concerns, and so plaintiff's complaints about their conduct *were* complaints about patient

19   safety.  Instruction No. 22A did not interfere with plaintiff's ability to present this theory.

20
21

---

22   [24] In opening statements alone, plaintiff's counsel used the term "hostile work environment"
on four separate occasions:

23
24
- "And she goes to complain to him and says: Listen this is a hostile work environment
for me.  Nobody is listening."
- "She thinks Mr. Palmquist is listening to her hostile work environment complaint.
She thinks he's going to remedy it."

25
- "So Beth thought it was in order to help the situation with the hostile work
environment."

26
27
- ". . . so she complained about a hostile[] work environment August 1st.  August 28th,
she gets the PIP.  Okay?"

28   Trial Tr. vol. 1, 117:6-8, 118:8-10, 118:13-14, 119:17-18.  The term was also used by plaintiff's
counsel and by witnesses numerous times throughout the course of trial.

United States District Court
Northern District of California

In sum, the Court finds that, "looking to the instructions as a whole, the substance of the applicable law was fairly and correctly covered." *See Pollack*, 540 F.2d at 426.  The Court denies plaintiff's motion for a new trial based on Instruction No. 22A.

### 3.    California Laws (Plaintiff's Proposed Special Instructions 3-5)

Finally, plaintiff argues that it was error for the Court not to give plaintiff's proposed Special Instructions 3-5, which were statements of California law that plaintiff says "provided context to her complaints to assist the jury (and the Court) in understanding why Plaintiff's complaints met the statutory definition."  Dkt. No. 139 at 29.

These proposed instructions read:

**SPECIAL INSTRUCTION NO. 3**

> No registered nurse shall be assigned to a nursing unit or clinical area unless that nurse has first received orientation in that clinical area sufficient to provide competent care to patients in that area, and has demonstrated current competence in providing care in that area.

*Authority: Health and Safety Code § 1276.4(e)*

. . .

**SPECIAL INSTRUCTION NO. 4**

> A registered nurse is required to directly provide the planning, supervision, implementation, and evaluation of the nursing care provided to each patient. The planning and delivery of patient care shall reflect all elements of the nursing process: assessment, nursing diagnosis, planning, intervention, evaluation and, as circumstances require, patient advocacy, and shall be initiated by a registered nurse at the time of admission.

*Authority: 22 Cal. Code Reg. § 70215(a)(2); (b)*

. . .

**SPECIAL INSTRUCTION NO. 5**

> Hospitals are required to provide staffing by licensed nurses, within the scope of their licensure in accordance with the following nurse-to-patient ratios.
>
> No hospital shall assign a licensed nurse to a nursing unit or clinical area unless that hospital determines that the licensed nurse has demonstrated current competence in providing care in that area, and has also received orientation to that hospital's clinical area sufficient

to provide competent care to patients in that area. The policies and procedures of the hospital shall contain the hospital's criteria for making this determination.

Licensed nurse-to-patient ratios represent the maximum number of patients that shall be assigned to one licensed nurse at any one time. "Assigned" means the licensed nurse has responsibility for the provision of care to a particular patient within his/her scope of practice. There shall be no averaging of the number of patients and the total number of licensed nurses on the unit during any one shift nor over any period of time. Only licensed nurses providing direct patient care shall be included in the ratios. Licensed nurses shall be included in the calculation of the nurse-to-patient ratio only when the licensed nurse has a patient care assignment, is present on the unit, and is not on a meal break or other statutorily mandated work break.

In the intensive care newborn nursery service, the ratio shall be 1 registered nurse: 2 or fewer patients at all times. Only registered nurses shall be assigned to intensive care newborn nursery service units.

*Authority: 22 Cal. Code Reg. § 70217(a),(a)(1)*

Dkt. No. 119 at 45-47.

Defendant argues that it would have been prejudicial to defendant for these instructions to come in, as the special instructions cite to California laws that were never cited in the operative complaint and that were never identified as sources of public policy to which plaintiff's wrongful termination claim was tethered. Dkt. No. 158 at 19.

In her motion, plaintiff analogizes to California Labor Code section 1102.5, a different whistleblower statute that prohibits retaliation against an employee for disclosing information that the employer has violated a statute or regulation. *See* Dkt. No. 139 at 30. But here, plaintiff never brought a claim under Labor Code section 1102.5. She sued under Health and Safety Code section 1278.5, which bars retaliation for whistleblowing in healthcare settings, and she has been clear from the beginning of the case that her wrongful termination claim was tethered to the public policy embodied in Section 1278.5. Plaintiff never argued, leading up to trial or at trial, that she was terminated for making complaints regarding violations of any of the specific laws cited in her proposed Special Instructions Nos. 3-5.

For that reason, plaintiff's reliance on *Hunter v. County of Sacramento*, 652 F.3d 1225, 1231-32 (9th Cir. 2011), is misplaced. *See* Dkt. No. 170 at 3-5. In *Hunter*, the Ninth Circuit remanded for a new trial after finding the district court erroneously failed to give the plaintiffs' proposed

United States District Court
Northern District of California

instructions regarding municipal liability under *Monell*.  The jury was instructed that each plaintiff would have to prove, *inter alia*, that the excessive force used against them at the County jail was committed "pursuant to a long-standing practice or custom of Defendant[.]"  *Hunter*, 652 F.3d at 1233.  The district court also gave the Ninth Circuit Model Instruction, proposed by the defendant, that defined "practice or custom" as "any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant."  *Id.*  Without explaining why, the district court declined to give any of the plaintiffs' proposed instructions.  Those instructions included statements of Circuit law on which the plaintiffs' theory of the case depended, such as: "Plaintiffs may also attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded."  *Id.* at 1234.  The Ninth Circuit explained that without plaintiffs' proposed instructions, "the jury would not have known whether to consider the evidence that numerous instances of excessive force at the Main Jail were never investigated and that their perpetrators were not punished."  *Id.* at 1235-36.  The Ninth Circuit explained, "Consequently, we cannot conclude that it is more probable than not that the instructional error was harmless."  *Id.* at 1236.

This case would be more like *Hunter* if the jury had been instructed that plaintiff had a claim for wrongful discharge in violation of public policy but then did not accurately instruct the jury on what might constitute a violation of public policy.  Here, however, there was only one public policy at issue—the one embodied in Health and Safety Code section 1278.5—and the jury received instruction accordingly.[25]  Plaintiff does not, and cannot, argue that the instruction given to the jury was an incomplete statement of the law which omitted the very theory that was key to her case, as occurred in *Hunter*.  *See id.* at 1233-34.

For these reasons, the Court denies plaintiff's request for a new trial based on the failure to give plaintiff's proposed Special Instructions 3-5.

---

[25] The wrongful discharge instruction in this, Jury Instruction No. 22, was given just as the parties jointly requested, based on CACI 243.  Dkt. No. 119 at 13.

United States District Court
Northern District of California

### C.    Discovery Misconduct

This issue was previously raised during pretrial motion practice.  In her opposition to defendant's motion to exclude plaintiff's human resources expert James Potts, plaintiff's counsel stated that she had recently discovered a number of relevant hospital personnel policies that defendant did not produce in discovery.  *See* Dkt. No. 91.  The Court deferred ruling on the motion in limine and ordered defense counsel to file a declaration explaining what personnel policies were requested, what policies were produced, and why the policies identified by plaintiff were not produced.  Dkt. No. 97 at 5.  Defense counsel filed a declaration explaining that: (1) most of the policies plaintiff identified were policies of Stanford Health Care, which is a separate legal entity from LPCH; and (2) the LPCH policies plaintiff identified were not used to support LPCH's defenses, and so defendant was not required to produce them.  *See* Dkt. No. 98.  In ruling on the motion in limine, the Court found that defendant wrongly withheld two policies: the LPCH 2011 Code of Conduct and the LPCH 2019 Code of Professional Behavior of Medical Staff and Physicians-in-Training Policy.  The Court found those policies should have been produced.[26] Nevertheless, the Court granted defendant's motion to exclude plaintiff's human resources expert finding, *inter alia*, that "[t]he fact that plaintiff did not provide Mr. Potts with even the LPCH policies that had been produced up to that point belies plaintiff's argument that the production of two additional LPCH policies would have altered the report."  Dkt. No. 103 at 8.

Plaintiff now argues that defendant's failure to produce relevant policies in discovery warrants a new trial.  Plaintiff cites to the misconduct standard the Ninth Circuit employed in *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990), in which a highly probative document came to light after the plaintiff received an adverse verdict.  Applying the standard for Federal Rule of Civil Procedure 60(b)(3), the court explained that to prevail on a Rule 59 motion based on discovery misconduct,

///

---

[26] In her Request for Production No. 4, plaintiff requested "Any and all written personnel policies or procedures in the NICU during the period in which Plaintiff was employed by YOU." Dkt. No. 91 at 8.

the movant must,

(1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct.

(2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense. Although when the case involves the withholding of information called for by discovery, the party need not establish that the result in the case would be altered.

*Id.* The *Jones* court remanded because it did not appear the district court considered the alleged misconduct in deciding Jones's Rule 59 motion: "the district court did not hold a hearing to determine whether there had been misconduct, either knowing or accidental, nor did it make findings on this issue." *Id.* at 879.

Defendant argues that *Jones* is inapposite because that case involved evidence discovered after trial. Here, plaintiff had the policies in question by the time of the pretrial conference and was able to, and did, use them at trial. Defendant also argues that if the policies were so critical that further discovery was needed, plaintiff could have moved to reopen discovery or to move the trial date.[27]

The Court agrees with defendant that under the facts here plaintiff has not shown grounds to disturb the jury's verdict. Although defendant wrongfully withheld the two relevant policies, plaintiff has not proven "by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct." *See id.* at 878-79. The Court accepts the declaration of defense counsel filed at Dkt. No. 98. While the Court disagrees with counsel's assessment that these policies were not relevant and need not have been produced, the Court sees nothing evincing fraud, misrepresentation, or other misconduct. The omitted policies came to light before the pretrial conference, and plaintiff used these documents in trial. *See* Trial Ex. 174. Moreover, as the Court previously explained in ruling on the motion in limine, the earlier production of the two policies would not have impacted plaintiff's ability to call a human resources expert in this case, given that

---

[27] Plaintiff responds to this last argument by stating that she did not ask to reopen discovery or move the trial date because she did not wish to burden the Court with such requests on the eve of trial, "especially given the Court's judicial emergency . . . ." Dkt. No. 162 at 17. The Court is not aware of any such "emergency."

plaintiff did not timely give the expert any of the LPCH policies that had been produced up to that point. While unfortunate, defendant's failure to produce two relevant policies, without more, does not warrant overturning the jury's verdict in this case, where plaintiff was able to and did use those policies at trial.

### D. Weight of the Evidence

Finally, plaintiff argues she is entitled to a new trial because the jury's verdict was against the weight of the evidence. For the same reasons explained above, *see* Section I, the Court finds the verdict was not against the clear weight of the evidence. To the contrary, there was substantial evidence to support the jury finding for the non-moving party. *See Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). Accordingly, the Court denies plaintiff's motion for a new jury trial on her claim of wrongful discharge in violation of public policy.

### CONCLUSION

For the foregoing reasons, plaintiff's motions for post-trial relief are DENIED.

**IT IS SO ORDERED**.

Dated: February 20, 2024

SUSAN ILLSTON
United States District Judge